[No. 12126.   Department Two.   May 18, 1915.]

## Henry L. Wilson et al., *Respondents*, v. The Sun Publishing Company, *Appellant*.[1]

Appeal and Error — Review — Amendments — Pleading.   Under Rem. & Bal. Code, § 1752, which requires the decision of a cause on appeal on its merits, disregarding technicalities, and considering amendments as made, the denial of a motion for nonsuit, in an action of libel, on the ground that the complaint did not allege the falsity of the publication, is not prejudicial, where the complaint negatived in terms every charge made in the publication and the answer averred the truth of the publication, thus supplying the alleged deficiencies.

Libel and Slander—Pleading—Falsity.   If matter published is libelous *per se*, it is not incumbent upon plaintiffs to allege its untruth; but, under Rem. & Bal. Code, § 293, that is a matter of defense which must be alleged and proven, in order to be available as such.

Continuance—Grounds—Trial Amendment.   A motion for continuance on granting leave to plaintiff to amend his complaint during the trial was properly denied, where the amendment presented no new issue.

Libel and Slander—Actionable Words—Privilege.   Newspaper publications falsely charging the plaintiffs with conducting a restaurant in an uncleanly and unsanitary manner do not fall within the rule of qualified privilege, and are therefore libelous *per se*.

Same—Injury to Business.   Under Rem. & Bal. Code, § 2424, providing that every malicious publication tending to expose any person to contempt, or to deprive him of public confidence, or to injure any

[1]Reported in 148 Pac. 774.

person in his business or occupation shall be a libel, it is libelous *per se* to charge in newspaper articles that plaintiffs' restaurant is dirty, unsanitary, poorly ventilated, and the abode of microbes, etc., the natural tendency of the words used being to create the impression that the restaurant was an unwholesome place and unfit for public patronage.

SAME—CIVIL ACTION—MALICE.    The civil action for damages for libel being, under the statutes of this state, one for the recovery of compensatory damages only, malice is not an essential element of allegation or proof.

SAME — ACTION — PARTIES.    A publication touching partnership business may be libelous without mentioning the names of the individual partners, where, by designating the business name under which the plaintiffs operated, the article had just as damaging an effect upon the partnership business as if it had mentioned the names of the partners.

SAME—DAMAGES—NOMINAL DAMAGES.    In an action for libel to recover upon a publication libelous *per se*, the plaintiff is entitled to nominal damages, although there may have been a failure of proof of damages, where the verdict of the jury on conflicting evidence finds that the charges were untrue.

SAME—ACTUAL DAMAGES—SUFFICIENCY OF EVIDENCE.    In an action for civil libel in publishing untrue articles respecting plaintiffs' restaurant, proof of actual damages occasioned thereby to plaintiffs' business was not established by evidence showing a diminution of patronage, where it appears that plaintiffs' own books showed a steady falling off, beginning prior to the articles and continuing thereafter at about the same ratio, that several competing restaurants had been established in the neighborhood during the period of the decline of plaintiffs' business, and there was no more than vague testimony touching a few isolated instances of desertion by patrons because of the articles, constituting no more than a scintilla of evidence of damage reasonably traceable to the publication.

SAME—EVIDENCE—ADMISSIBILITY.    In an action for libel charging that defendant's untrue publications had injured the business of plaintiffs, evidence of what plaintiffs paid for the business and what they sold it for was inadmissible for the purpose of showing damages suffered.

SAME—ACTION—EVIDENCE.    In an action for civil libel instituted by partners for damages to their partnership business, evidence of injury to the reputation and feelings of either partner as an individual is inadmissible.

LIBEL AND SLANDER—ACTION—INSTRUCTIONS.    In an action for libel brought by a partnership, it is error to instruct the jury to find

for plaintiffs, if the articles published were calculated to injure the plaintiffs either in their reputation or in their business, by exposing them or either of them to ridicule or contempt, or injuriously affect the reputation of either of them in the community, when there was little evidence of injury to the reputation of either partner, and no evidence of injury to the separate business of either, and the only damages recoverable would be by the partners in their joint capacity.

Appeal from a judgment of the superior court for King county, Humphries, J., entered March 2, 1914, upon the verdict of a jury rendered in favor of the plaintiffs, in an action for libel. Reversed.

*John P. Hartman* and *Arthur E. Nafe*, for appellant.

*Tucker & Hyland*, for respondents.

ELLIS, J.—In August, 1913, the plaintiffs were, and since October, 1912, had been, copartners operating a cafeteria known as the Epler Cafe, on Second avenue, in the city of Seattle. They commenced this action on August 29, 1913, to recover damages for injuries to their business which it is claimed were caused by certain articles printed and published in The Seattle Sun, a newspaper then being published by the defendant. The first publication was on August 1, 1913, and reads as follows:

"Restaurant Kitchen an Awful Place in Summer Time Says Sun Reporter After a Visit to One.

"Tour Yesterday Reveals Many Changes for Better in Seattle, but He Lands in Cafeteria Where Rotary Fan is Only Thing That Makes Life Possible.

"(By the Author of 'The Confessions of a Dishwasher.')

"If it were not for the big rotary fan in the Epler Cafeteria kitchen, nothing could live there—not even a microbe. Certainly nothing could exist there without holding its nose.

"This is summertime in the kitchens. The hot sun which beats down upon the streets is not hotter than the roasting oven in the kitchen where foodstuffs spoil quickly and microbes grow fat.

"There has been a general cleaning up in most of the Seattle restaurant kitchens and dishwashing parlors since The Sun started its clean-up campaign. In some places it has been barely noticeable—the trickle of hot water sounding the

first call to cleanliness, or the swish of a scrubbing brush on saturated floors. In other places, the transformation has been complete. Old saturated wooden tables, drainboards and ice boxes have been torn out, and new metal ones put in their places. Pervious floors have been ripped up to make room for clean white tile.

## "Eat in More Comfort

"I am a quick luncher and a haunter of restaurants. And I confess that I am beginning to eat my three meals a day with a greater degree of comfort.

"In my daily travels I have noticed peculiar things—such as new refuse cans with real lids on them, in the alley behind Rippe & Chapman's combination kitchen, and real steam rising from the dishwasher at the White Lunch.

"But yesterday it was hot—real hot for Seattle—and I had a real or imagined desire to find out how the living is in a hot kitchen in hot weather. A friend and I chose a kitchen at random—one to which I had not paid an extended visit before. It happened to be the Epler Cafeteria, 813 Second avenue.

"To repeat, nothing could survive there if it were not for a big rotary fan which appears to have been attached to a motor and placed in the window for the express purpose of forcing an exit for ill odors arising from food scraps which are on the first road towards disintegration.

## "Ice-Box Hash.

"The floors of the kitchen were wet, slippery and littered with food scraps. Dishes covered with food from the last meal were left standing on the drainboard near the dishwashing machine. Filthy saturated wooden tables were absorbing the moisture from the latest left-overs.

"And the ice-boxes—saviors of food in the summer time, but flavor mixers and microbe harbors at the Epler Cafeteria. They were old, saturated, wooden affairs, capable of absorbing anything, even the roasting heat of the kitchen.

"We opened them one by one and looked inside. There, in each one, piled together was the greatest assortment of foods which I have ever seen accumulated in a single ice-box. It might have been appetizing—to one who is fond of hash.

## "A Fish Box's Contents.

"There were things to eat, all the way from potatoes and hamburger steak to the latest salads and mayonnaise dressings, in a fish box.

"But it was not quite so appetizing when we took a knife and scraped from the saturated wooden trays and walls of the ice box the remains of former meal preparations—generations upon generations of them, it appeared to me.

"And the refuse cans and the scraps which were spilled over make it fortunate there are not many flies in Seattle.

"Yesterday we paid a visit to other restaurants in Seattle, which is another story.

"And before long we shall visit other restaurants—other stories."

The second article was published on August 4, 1913, and reads as follows:

"Conditions in Local Restaurants.

"It is a matter of common knowledge that many restaurant kitchens, also many hotel kitchens, are carelessly conducted and in some cases are absolutely filthy.

"For years no effort was made by the city authorities of Seattle to properly supervise restaurant and hotel kitchens, and there seemed to be no escape from the uncleanly conditions for the thousands of people who patronize these places.

"It is true that there were restaurants and hotels where these bad conditions did not exist, and which were cleanly in every respect, but the good and the bad were so indiscriminately mixed together, that there seemed to be no possible way for the public to distinguish between them.

"The Seattle Sun undertook a public service in investigating these places, and to do so had men go to work in them as dishwashers, etc., for the purpose of securing information.

"As a result many facts were secured and published in The Sun and there followed a general cleaning up all along the line.

"Conditions today average much better than they did some months ago.

"The Sun has, however, determined to follow this matter up from time to time and see whether the reformation is progressive, rather than retrogressive.

"Last week this newspaper contained some strictures on certain cafeterias, including Epler's the kitchen of which was visited by two Sun representatives on a very hot day.

"Objections to the statements made by these men and printed in The Sun are made by Mr. Wilson, one of the pro-

prietors, and by others who are friends of the management.

"Mr. Wilson states that immediately following the appearance of The Sun with the strictures on his kitchen he invited fifteen or more of his regular patrons to walk out in his kitchen and investigate for themselves.

"This information The Sun gives as a matter of course, and it also publishes a letter from Edward C. Kilbourne, manager of the building, who states that the kitchen is clean and sanitary. There is not the slightest desire upon the part of The Sun to misrepresent the conditions in Epler's or in any other eating place.

"The men sent out by The Sun to investigate the restaurants do not in any way alter their report, however. They were absolutely unbiased and were acting under rigid instructions to render truthful accounts of everything they discovered.

"The dishwashing arrangements in Epler's were found to be modern and in every way sufficient. The criticisms made were all directed at specific kitchen shortcomings.

"The task of bringing all local restaurants up to a general high average of cleanliness is making The Sun some enemies among proprietors and managers, and there is a loud protest from several of them, who charge loss of business, etc.

"The sensible restaurant proprietor who has been criticised will devote all his energies to immediately putting his kitchen in a condition above reproach, and will waste no breath in idle denunciations.

"He should recollect that restaurants are in reality public service institutions and that the people have a right to demand the very best service from them."

The final article complained of was printed in The Seattle Sun on August 5, 1913, and reads as follows:

"Finds It Quite Possible to Keep Restaurant Kitchens Cool and Clean.

"Sun Reporter Visits Wing's Cafeteria, Gerald's Cafe and the Hofbrau—Ice Boxes May Be Clean and Dry Also.

"(By the Author of 'The Confessions of a Dishwasher.')

"The same afternoon last week on which I visited the Epler Cafeteria I made a trip also through the kitchens of Gerald's Cafe, 824 First Avenue, Wing's Cafeteria, 1409 First avenue,

and the Hofbrau Cafe, First avenue and Madison street. These were all cleaner than the Epler kitchen.

"Soon after The Sun began to look into Seattle kitchens and dishwashing establishments, Wing's Cafeteria proceeded to rip out old floors and fixtures of its old kitchen and start in afresh with everything clean and white. All the old dishwashing things were destroyed. In place of old floors was laid white tile, while metal tables, trays and shelves took the places of old wooden ones.

"The arrangements for dishwashing in Wing's Cafeteria are entirely separated from the kitchen. The dishes have a large sunny room all to themselves—a room with plenty of air in it, with white walls and ceilings and a white tiled floor. Except for one board on which the dishes are placed after they are washed and dried, there is not an inch of wood in the place. Everything is solid, of stone or metal. Cracks and crevices and porous surfaces in which food might collect are unheard of.

"Diners May Witness.

"There are three dishwashing outfits in this white room, one for washing and rinsing plates and platters, another for washing and rinsing silver and glasses, and still a third for pans.

"Steaming hot water is running in all of them. The room enters directly into the big dining room, so that diners may have a full view of the process if they wish. It is high above the ground and through its spacious windows overlooks Elliott Bay.

"The kitchen where the food is prepared and cooked is downstairs below the dishwashing room, but not below the surface of the earth. It is clean and dry with hard, substantial walls and floors. Everything is fresh and clean-smelling.

"The combination kitchen and dishwashing establishment of Gerald's Cafe, 824 First avenue, was almost unbearably hot on that warm afternoon when I visited it. The kitchen appeared to be buried in the side of the first hill. It was dark and ventilated by only one small window at the top, which was at the surface of the earth.

"Hot at Gerald's.

"Gerald's kitchen was roasting hot, like its big brick oven, and it lacked circulation of fresh air. It was cleaner than the Epler kitchen, not as clean as Wing's and the Hofbrau.

"There were old saturated wooden tables and shelves, which had the appearance, however, of being scrubbed occasionally. This, like the other kitchens which I visited that afternoon, was equipped with a hot water dishwashing outfit, capable of handling and really cleaning the dishes of its customers. The floor was wet in some places, and I noticed a few scraps of food scattered about. It was a substantial, level floor, however, and offered a solid footing. There was no fan in the kitchen. With its one tiny skylight window at the top, it resembled an old-fashioned bake oven itself.

"Hofbrau Cool and Clean.

"The kitchen of the Hofbrau Cafe was cool and clean. Its solid cement floor was especially clean, dry and free from dirt, grease and wet. There were wooden tables—but they were solid and made of hard wood. And they were white and clean, free from grease.

"Ice boxes and fish boxes in the Hofbrau were cool and appetizing as I opened them. They were not hash boxes. Each separate variety of food had a separate apartment all its own to keep fresh in. Fish were placed in one box, meats in another, vegetables in a third, while butter and dairy products were kept entirely separate. Each cut of meat appeared as fresh as the day it was killed. The fish has its own icy room away from the butter. There was no evidence of stale food remainders on the inside linings. The interiors of the boxes were clean, cool and dry. It was possible to light a match on the inside wall. I did it."

The complaint alleges that the plaintiffs' restaurant had always been carried on in a first-class manner and had always been clean, sanitary and well ventilated; that prior to the publication complained of, the business, with the good will thereof, was of a reasonable value of $30,000; that the libelous matter was published maliciously and without probable cause or any cause whatever; that the things set forth were false and untrue, and were known to be untrue by the officers and manager of the defendant when they were published; that by reason of the publication of the articles complained of the plaintiffs, both in their business and as citizens of Seattle, have been injured in their good name, fame and credit

and brought into public scandal, infamy and disgrace among all those people among whom they had been doing business; that the good will of their business has been destroyed, and that plaintiffs have been damaged in the sum of $25,000. The allegation of falsity was inserted by amendment, over defendant's objection, at the close of the plaintiffs' evidence.

In its answer the defendant denied the allegation that plaintiffs' restaurant was clean, sanitary and well ventilated; denied that the business was worth $30,000 at the time of the publication of the articles complained of; admitted the publication of the articles; denied that the publications were made maliciously; denied that the plaintiffs were damaged in the sum of $25,000, or any amount; and, as an affirmative defense, averred that the facts published in the articles were true and were published with a full belief of their truth, without malice and for the protection of the citizens of and visitors to the city of Seattle. The reply traversed the affirmative matter in the answer.

The evidence is too voluminous to be set out in a connected statement. We shall discuss it so far as necessary in the consideration of the points presented. At appropriate times the defendant moved for a nonsuit and for a directed verdict. These motions were overruled. The jury returned a verdict in favor of the plaintiffs in the sum of $7,500. The defendants moved for a verdict *non obstante* and for a new trial. These motions also were overruled. From the judgment entered upon the verdict, the defendant appeals.

While there are many assignments of alleged error, we shall consider only those which seem necessary to a proper disposition of the case.

As preliminary to the discussion on the merits, a question of pleading is presented. It is claimed that a nonsuit should have been granted because, when the motion was made, the complaint contained no allegation that the offending publications were untrue, hence did not state a cause of action. For many reasons there is no merit in this claim. In the first

place, the complaint negatived in terms, by its direct allegations of cleanliness and sanitation, every charge made in the publications.   In the second place, the answer averred the truth of the publications, thus supplying the supposed deficiencies now complained of and further emphasizing the issue to which the respondents' evidence was directed.   In such a case we are admonished by the statute to proceed with the decision of the cause on its merits, disregarding technicalities.   Rem. & Bal. Code, § 1752 (P. C. 81 § 1255); *German American Bank of Seattle v. Wright,* ante p. 460, 148 Pac. 769; *Yeisley v. Smith,* 82 Wash. 693, 144 Pac. 918; *Kelly v. Lum,* 75 Wash. 135, 134 Pac. 819, 49 L. R. A. (N. S.) 1151; *Gaskill v. Northern Assurance Co.,* 73 Wash. 668, 132 Pac. 643; *Bonne v. Security Savings Society,* 35 Wash. 696, 78 Pac. 38.

In the third place, if the matter published was libelous *per se,* it was not incumbent upon the respondents to allege its untruth.   That was a matter of defense which to be available must be alleged and proven as such.   Rem. & Bal. Code, § 293 (P. C. 81 § 277).   At common law, of which the statute is merely declaratory, the truth of a libelous charge, though no defense in a criminal prosecution for libel, was usually a complete defense in a civil action for damages. *State v. Sefrit,* 82 Wash. 520, 144 Pac. 725; *Haynes v. Spokane Chronicle Pub. Co.,* 11 Wash. 503, 39 Pac. 969; *Leghorn v. Review Pub. Co.,* 31 Wash. 627, 72 Pac. 485; 4 Blackstone, Commentaries, p. 150.

This disposes also of appellant's claim that the court erred in refusing a continuance when respondents were permitted to amend their complaint by inserting the specific allegation that the publications were false.   This presented no new issue.   The motion for a continuance was properly denied.

On the merits it is contended that a verdict for the appellant should have been directed at the close of all the evidence. Several reasons are assigned for this claim.   We shall consider them in what seems to be their logical order.

I.  It is claimed, in substance, that the offending publications, being merely critical of matters of public interest, fall within the rule of qualified privilege and were therefore not libelous *per se*.  Matters of such public interest as fall within the rule of qualified privilege are classified in Newell on Slander and Libel (2d ed.), p. 576, as follows:

"(1) Matters concerning the administration of the government.   (2) Matters pertaining to the administration of public justice.   (3) Matters relating to the management of public institutions and local authorities.   (4) Matters relating to appeals for public patronage.   (5) Matters concerning literary publications, books and pictures.   (6) Matters concerning the character and quality of public entertainments.   (7) Matters relating to religious bodies, churches and associations."

It is obvious that the publications here in question do not fall within any of these classes unless it be "matters relating to appeals for public patronage."  That class, however, relates to those who are in a sense public characters, such as seekers for office, artists, inventors, showmen, patent medicine men, and such others as by appeals to the public by advertisement, in a special sense directly challenge public criticism of their claims.  Newell, Slander and Libel (2d ed.), p. 583.  There is nothing of that nature in the case presented here.  The mere fact that a man's business, in a sense, touches the health and comfort of his customers or patrons does not invoke the rule of special privilege against him.  Those who desire to criticise the manner in which his business is conducted are sufficiently protected against an action for damages by their absolute immunity in publishing the uncolored truth, and against a criminal prosecution in a proper case by negativing malice, which, under our present criminal statute, is the gist of the criminal offense of libel.  *State v. Sefrit, supra*.  We have been cited to no authority, and have been able to find none, which would carry the rule of qualified privilege to the extent here asserted.

17—85 WASH.

II.   Not being privileged, the next question is:   Were the articles libelous *per se?*   Our criminal statute defines libel against the living as follows:

"Every malicious publication by writing, printing, picture, effigy, sign or otherwise than by mere speech, which shall tend:

"(1)  To expose any living person to hatred, contempt, ridicule or obloquy, or to deprive him of the benefit of public confidence or social intercourse; or   .  .  .

"(3)  To injure any person, corporation, or association of persons in his or their business or occupation, shall be a libel.   .  .  .   Rem. & Bal. Code, § 2424 (P. C. 135 § 343).

Eliminating the statutory element of malice, either actual or implied, an essential only of criminal libel, this definition meets the essentials of libel actionable *per se* as generally recognized in civil actions for damages.   Newell, Slander and Libel (2d ed.), p. 43.

"Unfortunately, the law of libel has been obscured by a mass of technicalities and subtle refinements.  When language is used concerning a person or his affairs which, from its nature, necessarily must, or presumably will, as its natural and proximate consequence, occasion him pecuniary loss, its publication *prima facie* constitutes a cause of action, and *prima facie* constitutes a wrong, without any allegation or evidence of damage other than that which is implied or presumed from the fact of publication; that this is all that is meant by the term 'actionable *per se*.'  Therefore the real practical test, by which to determine whether special damage must be alleged and proved in order to make out a cause of action for defamation, is whether the language is such as necessarily must or naturally and presumably will, occasion pecuniary damage to the person of whom it is spoken." *Pratt v. Pioneer-Press Co.,* 35 Minn. 251, 28 N. W. 708.

That the articles here in question had the clear tendency to injure the respondents in their partnership business is too plain for argument.   They charged that this restaurant was hot, dirty, poorly ventilated, and insinuated the presence of "microbes."   The natural meaning of the words used was

that the restaurant was an unwholesome place and unfit for public patronage. It has been held libelous *per se* to charge the sale of diseased and unwholesome meat. *Mowry v. Raabe,* 89 Cal. 606, 27 Pac. 157; *Young v. Kuhn,* 71 Tex. 645, 9 S. W. 860. It has also been held actionable *per se* to charge that a hotel keeper "kept no accommodations, and a person could not get a decent meal or decent bed if he tried." *Trimmer v. Hiscock,* 27 Hun (N. Y.) 364. The articles here in question were, from their natural tendency, actionable *per se.*

III. It is next claimed that there was a failure of proof because there was no evidence of malice. If this were a criminal prosecution, malice would be a material element and would be inferred from the necessary tendency of the articles. The criminal statute so declares. Rem. & Bal. Code, §§ 2424, 2425 (P. C. 135 §§ 343, 345). But in this state malice is not an essential element of civil libel. This results from the nature of the case. The civil action for libel is an action for damages, and, as in other actions sounding in tort, compensatory damages only can be recovered. It is obvious that these would be the same no matter what the motive which inspired the publication. Malice could only be material on the question of punitive or exemplary damage. But in this state punitive or exemplary damages cannot be recovered except where specifically authorized by statute. *Spokane Truck & Dray Co. v. Hoefer,* 2 Wash. 45, 25 Pac. 1072, 26 Am. St. 842, 11 L. R. A. 689; *Willson v. Northern Pac. R. Co.,* 5 Wash. 621, 32 Pac. 468, 34 Pac. 146; *Sloan v. Langert,* 6 Wash. 26, 32 Pac. 1015; *Seattle Crockery Co. v. Haley,* 6 Wash. 302, 33 Pac. 650, 36 Am. St. 156; *McGill v. Fuller & Co.,* 45 Wash. 615, 88 Pac. 1038; *Caldwell v. Northern Pac. R. Co.,* 56 Wash. 223, 105 Pac. 625; *Baer v. Chambers,* 67 Wash. 357, 121 Pac. 843, Ann. Cas. 1913 D. 559; *Phillips v. Thomas,* 70 Wash. 533, 127 Pac. 97, Ann Cas. 1914 B. 800, 42 L. R. A. (N. S.) 582; *Corcoran v. Postal Telegraph-Cable Co.,* 80 Wash. 570, 142 Pac. 29. We have no statute allowing exemplary or punitive damages for libel.

In two cases this court has held that, in a civil action for libel, the element of malice is immaterial. *Byrne v. Funk*, 38 Wash. 506, 80 Pac. 772; *Woodhouse v. Powles*, 43 Wash. 617, 86 Pac. 1063, 117 Am. St. 1079, 8 L. R. A. (N. S.) 783.

In the *Byrne* case, this holding was apparently based on the fact that malice was not included as an essential element in the then existing statute defining criminal libel. Ballinger's Code, § 7087; Rem. & Bal. Code, § 2777. In the *Woodhouse* case, it was based definitely, and as we now conceive more logically and soundly, upon the ground that compensatory damages alone can be recovered in a civil action for libel. While our present statute defining criminal libel makes malice an essential element, that is because the action is punitive in its nature. The civil action being merely compensatory in its nature, and there being no statute authorizing punitive damages in such cases, it follows of necessity that malice or lack of malice is still immaterial in such cases, notwithstanding the change in the statutory definition of criminal libel.

IV.    It is also urged that the articles were not libelous in that they did not mention the name of either of the respondents. We find no merit in this claim. The complaint, considered in its entirety, did not state a cause of action in favor of the respondents as individuals, but as partners. The libel was a libel touching their partnership business. The articles did mention the name of that business, which was known as the "Epler Cafe." By designating the name of their business, the article had just as damaging an effect upon the partnership business as if it had mentioned the names of the partners.

V.    Finally, it is asserted that there was a total failure of proof of damages. Though the publication was not actuated by malice, it was actionable *per se*. The respondents were at least entitled to nominal damages, unless the things stated in the offending articles were true. The appellant attempted

to prove their truth in justification. There was much evidence so tending. There was also much evidence to the contrary. On this conflict of evidence the question was clearly one for the jury. The verdict, being supported by substantial evidence that the charges were untrue, concludes the question. A review of this phase of the evidence would be useless.

But it was still incumbent on the respondents to prove actual damages to justify a recovery more than nominal. They attempted to prove specific damages by evidence of a falling off of the patronage of the restaurant, occasioned by the publication of the articles. Over appellant's objections, they sought to show, by the testimony of certain employees and a few customers, that there was a decided falling off in patronage immediately following the publication of the articles, especially after the appearance of the first article. This evidence was vague and unsatisfactory at best. They also introduced their books of account, but these showed that, beginning some six months prior to the publication of the first article, there had been a gradual falling off in attendance and a consequent reduction in the receipts of the business, and that this reduction continued at practically the same rate subsequent to the publication of the articles as prior thereto, until the restaurant was finally sold in December, 1913. They also introduced in evidence, over objection, a list of names of some nineteen persons who, it was stated by one of the respondents, stopped dining at the Epler Cafe immediately following the publication of the articles. He admitted, however, that as to most of these his information was based on hearsay. The other partner, who furnished the list, did not attempt to say that, by interviewing the persons named, or otherwise, he learned their reasons for the discontinuance. Four or five witnesses testified that they stopped dining at the restaurant after the publication of the articles. One of them had dined there but once. Another testified that he personally knew of the condition of the kitchen and only two or three of them testified that they failed to return to the

respondents' restaurant on account of the publications. Over objection, the respondents were permitted to testify as to what they paid for the business and what it was finally sold for on December 1, 1913. The respondent Wilson testified that he bought his half interest in October, 1911, for $6,500, and the respondent Carle that he bought his half interest in October, 1912, for $6,800. Carle testified that when he sold he received for "the whole outfit" $3,500. It does not clearly appear whether this represented one-half of the sale price or the whole sale price. This last evidence was clearly inadmissible, especially in view of the fact that, prior to the publication of the articles, the respondents' own books showed that their business was already falling off at a rate which continued but was not accelerated after the publication of the articles in question. It is obvious that many other elements might have, and probably did, enter into the purchase price and sale price of a business such as a restaurant. The evidence seems to us entirely too speculative and remote to have any probative value on the issue of damages and should have been excluded.

The appellant introduced evidence of the fact that, during the period of the decline of the respondents' business, several competing restaurants and cafes were started in adjoining blocks and in the immediate neighborhood of their place of business. It is the undisputed testimony of experienced restaurant men that this fact alone would have a necessary tendency to diminish the respondents' business. A careful consideration of all of the testimony touching special damages by diminution in patronage occasioned by the offending articles, forces the conviction that there was no such proof of any material falling off of patronage or any measurable or material injury to respondents' business caused by the publications as to take the question of special damages to the jury. In view of the showing made by respondents' own books which indicated a steady falling off beginning long prior to the publication of the articles, and in view of the

proof that the near location of several competing establish-
ments would amply account for its steady continuance, we
think that the vague testimony touching a few isolated in-
stances of desertion of patrons because of the articles was
wholly insufficient to constitute more than a scintilla of evi-
dence of damage reasonably traceable to the publications.
The only reasonable inference is that it was due to the ade-
quate cause proven.

A case closely in point is presented in *Trimmer v. His-
cock, supra.* The defendant sued for damages for slanderous
words injuring his business as a hotel keeper. He attempted
to prove special damages by showing that, since about the
time of the alleged slanderous words, there was a falling off
in his business. This, however, was accounted for by the
plaintiff's own witnesses, who testified that about that time
a Good Templars organization was effected in the village
and that many of his old customers and patrons joined the
organization and ceased to frequent his house. Also, that
at about that time numerous prosecutions were instituted
against him for violations of the excise laws, and that it was
due. to this organization and these prosecutions that his
business declined. A nonsuit was granted, but the supreme
court held that while there was no proof of special damages,
the words were actionable *per se,* and remanded the case for
trial on that account.

VI. But one other question remains to be considered.
The respondents, over the appellant's objection, were per-
mitted to introduce the testimony of one of the partners as
to his standing and reputation and the standing of his fam-
ily in the community. It was objected that this testimony
was immaterial in that the action was one for injury to the
partnership business, and that injury to the reputations and
feelings of either partner as an individual was not in issue.
The objection was overruled, but the inquiry was not further
pursued. Little evidence was offered showing an injury to
the reputation of either of the partners, or humiliation or

mental suffering by either, on account of the publications. In any event we think such testimony was inadmissible. The rule which we conceive to be the correct one is thus stated in Newell, Slander and Libel (2d ed.), p. 371:

"Two or more partners may join in an action of slander for words spoken of them in the way of their trade, whereby they have sustained special damage. They may sue jointly for slander of them in respect of their trade without showing the proportion of their respective shares. But damages cannot be given in such an action for any injury to the private feelings of the plaintiffs, but only for such injury as they may have sustained in their joint trade or business."

The Supreme Judicial Court of Massachusetts, in *Gazynski v. Colburn*, 11 Cush. 10, states the rule as follows:

"It has always been held that when words are spoken of two or more persons, they cannot join in an action for the words, because the wrong done to one is no wrong to the other. The case of husband and wife is not an exception to this rule. The exceptions to it are the case of words spoken of partners in the way of their trade, and the case of slander of the title of joint owners of land."

In *Donaghue v. Gaffy*, 53 Conn. 43, 2 Atl. 397, the supreme court of Connecticut said:

"We will only add that it is well settled that, in an action for libel by two or more partners, damages cannot be recovered for any injury to their private feelings, but only for such injury as they may have sustained in their joint trade or business."

For a case closely analogous in principle, see also, our recent decision in *Hall v. Galloway*, 76 Wash. 42, 135 Pac. 478. The court, touching this question, instructed the jury as follows:

"If, therefore, you should find from the evidence that the defendant published the article or articles charged in the complaint and that they were calculated to injure the plaintiffs either in their reputation or in their business by either exposing them or either of them to ridicule or contempt or to

injuriously affect their reputation or the reputation of either of them in the community, or injuriously affect their business as restaurant proprietors, then, unless the defendant should prove it was justified in publishing the articles, you must find for the plaintiffs."

This instruction was repeated in substance several times in different parts of the charge. It is clearly erroneous for two reasons. In the first place, there was little evidence of injury to the reputation of either partner as an individual, and no evidence of injury to the separate business of either. The publications, though libelous *per se*, made no reference to either of the respondents personally except in one instance, and that in connection with the partnership property. They made no reference to the separate business of either. In the second place, the only damages recoverable in this action are, according to the foregoing authorities, such damages as resulted in injury to the partnership business itself, and to the partners in their joint capacity.

It is clear, therefore, that the judgment must be reversed. There was no evidence of special damages sufficient to take the case to the jury, and the element of damage to reputation or feelings, or the separate business of the respondents as individuals, could not be considered in this joint action. The respondents were only entitled to nominal damages under the evidence.

We find no merit in respondents' claim that there was a mere misjoinder of parties and that the objection thereto was waived by the failure of appellant to demur to the complaint. There was no misjoinder. The complaint itself was in the name of the plaintiffs as partners. The appellant had a right to construe it according to its legal effect as an action for damages to the partnership business. The objection to treating it otherwise was interposed as soon as evidence tending to prove individual damage was offered. A review of the authorities cited by respondents in this con-

nection would be idle. They are clearly distinguishable on the facts and in the nature of the cases.

The judgment is reversed, and the case is remanded with direction to enter a judgment for the respondents for nominal damages only.

MAIN, MOUNT, and CROW, JJ., concur.