[No. 21056. Department One. July 3, 1928.]

## J. H. RYAN, *Appellant*, v. TRIBUNE PUBLISHING COMPANY, *Respondent*.[1]

[1] LIBEL AND SLANDER (6, 7)—EXPOSING TO OBLOQUY—ACTIONABLE WORDS—INJURY TO BUSINESS. A complaint charges a libel *per se*, when it alleges newspaper articles charging the defendant with collusion in obtaining the publication of county printing during the term of his contract, which was about to expire, by delaying the printing of the weekly issue of his paper, subsequently issued and pre-dated, characterized as trickery, collusion and fraud, and an illegal transaction to secure an illegitimate payment of county funds, and the same is within Rem. Comp. Stat., § 2424, defining libel *per se* as a malicious publication tending to expose any person to obloquy, deprive him of public confidence, or injure him in his business or occupation.

Appeal from a judgment of the superior court for Pierce county, Hodge, J., entered September 24, 1927, upon the verdict of a jury in favor of the defendant, in an action for libel. Reversed.

*H. H. Johnston* and *A. H. Denman,* for appellant.

*Henderson & Carnahan,* for respondent.

TOLMAN, J. — Appellant as plaintiff brought this action to recover damages for libel, alleging in his complaint that he is the proprietor of a weekly newspaper of general circulation in the city of Tacoma and vicinity, known as Ryan's Weekly, and that the defendant is the publisher of a morning and an evening

[1]Reported in 268 Pac. 893.

paper in the same city, each of general circulation. It is further alleged:

"That the defendant on the 16th day of July, 1926, in its said afternoon and evening newspaper, falsely, wickedly and maliciously composed and published of and concerning the plaintiff, the matter following, to-wit:

" 'POLITICAL TRICK Is CHARGE: Shaw and Ball Condemn Rush Printing Deal; Won't O. K. Bill for Ryan's Weekly;

" 'Disclosures in connection with county printing, involving the publication of the notice in the foreclosure of tax liens in an alleged irregular way, had a quick reaction at the courthouse Friday, when County Commissioner Frederic Shaw and Henry Ball branded the "rush job" as "collusion" and a "political trick," and emphatically declared they would not approve the claim for payment unless ordered to do so by the court.

" 'Howard R. Carothers, deputy prosecuting attorney and candidate for prosecutor, whose name was indirectly mentioned in connection with the transaction in a published article, hastened to declare that he had no knowledge of the tax publication before it appeared and was in no way connected with it.

" ' "I want to say that the publication of this tax notice in Ryan's Weekly at this time is one of the rottenest pieces of collusion that ever came to my attention during my term in public office," Commissioner Shaw declared Friday. "No claim for the payment for the printing of this notice ever will be approved by me, unless I am directed to approve it by order of the court."

" 'Cheap Political Trick: "The publication of the tax notice under the circumstances is as cheap a political trick as ever came to my knowledge," Commissioner Ball asserted. "It appears to me that it was deliberately planned. So far as I am concerned as a member of the board of county commissioners, I will recognize no claim for payment of this printing, unless I am directed to do so by court order."

" 'The publication of the tax notice appeared in Ryan's Weekly, published by J. H. Ryan of Tacoma, negro member of the Legislature in 1923, and who has been prominently mentioned as one of the "rubber stamp" candidates for the Legislature this year. His publication had the contract for the county printing last year, the time expiring June 30 of this year.

" 'Call for Bids Issued: Prior to the expiration of the contract, bids for the coming year were called by the county commissioners. The contract was awarded to the American Standard of Sumner, published by Garrett Brothers.

" 'Just prior to the change in the county official paper, Ryan was given the job of publishing the tax notice, which is to run for seven consecutive weeks. The notice requires 13 newspaper pages and is the real plum of the county printing contract. Heretofore this notice has appeared later in the year, sometimes as late as December.

" 'The list of delinquent taxpayers is prepared by the county treasurer. Treasurer George M. Meath, now a candidate for county commissioner, declared that he wanted to get the matter out of the way this year so his books could be brought up to date before he left office, and declared there was nothing irregular in the transaction. He asserts that he had nothing whatever to do with the publication of the notice and says this matter is up to the prosecuting attorney's office.

" 'Refuse to Be Goat: Prosecutor J. W. Selden and Deputy Prosecutor D. D. Schneider refuse to be the "goat" on the matter. Mr. Selden says that Mr. Meath and Ryan appeared before him in June and requested that the transcript of the delinquent tax notice be prepared as quickly as possible. Mr. Schneider, to whom the work was delegated, says that the request for hurrying the matter along came from Mr. Meath.

" 'The court records in connection with the transaction show that all the papers were filed June 26, the alleged date of publication in Ryan's Weekly. The orders were signed by Superior Judge Fred G. Re-

mann at noon on that day, when the papers were taken to him by John H. Binns, deputy prosecutor, who, with Mr. Schneider, assisted in the work of preparing the list. The county clerk's office had closed at noon, but the papers were filed in open court by Mrs. C. Y. Grimes, deputy clerk in Judge Remann's court.

" 'Garrett Brothers to Take Action: Garrett Brothers have retained counsel to look into the matter, contending that Ryan was not legally entitled to the publication of the notice. It is asserted that, although the paper carrying the notice bears the date of June 26, it would have been physically impossible to have set the notice in type. The 13 pages of composition is in small type, most of it in tabular form, which would have required several days' work in any print shop in the city, it is claimed. It is asserted that, instead of having been published June 26, the paper carrying the legal notice did not, as a matter of fact, appear until a week later, or early in July.

" 'For this reason, it is contended, the question of the legality of the notice is raised. If it is found that the paper did not appear until July, while the notice bears date of June 26, the sufficiency of the notice to the delinquent property owners may be questioned, and may result in requiring the complete republication of the notice. This also may apply to other legal notices carried in the paper, several of which appeared, including notices in divorce actions and other matters.

" 'Copying was Days Late: Fred Angus, typist, who was employed in copying some of the work from the treasurer's books, has been quoted as saying he did not complete his task until June 29, or June 30, several days after the date carried by Ryan's Weekly. In this he has been corroborated by C. D. Savery, court stenographer, who turned the work over to him.

" 'It is claimed that Ryan's Weekly has lost one week of publication somewhere along the line; that the purported issue of June 26 is in fact the issue of July 3, and that of July 3 should have been July 10.

" 'Mr. Carothers, in denying any knowledge of the matter, Friday issued the following statement:

" ' "Inasmuch as my name has been mentioned in the papers in connection with the controversy over the publication in Ryan's Weekly of the tax foreclosure notice, and in order that those who do not know may not gain the erroneous impression that I may have had something to do with the handling of tax matters in our office, I wish to state that I had no knowledge that the notices were being prepared, or published, until after the first notice appeared in the paper. I have never been a subscriber to Ryan's Weekly, nor have I ever done any advertising in that paper." ' "

Then follow allegations of subsequent articles published, too numerous and too long to be here set forth in full, but which were replete with such statements and innuendoes as the following:

"RYAN's PLOT NOW ENTIRELY BALKED: Prosecutor stops Illegal Tax List Publication, Which Has Been Officially Called 'Rotten Collusion':

"A SNEAKING TRANSACTION

"Several very weak attempts have been made to explain the apparent trickery and collusion in the unlawful attempt to manipulate the county printing contract in the interest of J. H. Ryan, negro editor, which may invalidate a number of legal actions in Pierce county.

"The facts are thus far revealed that County Treasurer George Meath ordered preparation of the delinquent tax list as a 'rush job' in order that the list might be published by Ryan, whose contract for the county printing expired on July 1; that the county attorney's office force rushed preparation of the list; that the order for publication was signed by Judge Remann; that the negro editor made initial publication in an issue of his paper dated on June 26, but that this particular issue did not enter the mails until July 3; that the purpose of the entire transaction was to enable Ryan to collect for the publication at the expense of the Sumner American Standard, published by the Garrett Bros., since July 1 the legal county printers. County Commissioners Ball and Shaw have announced

that they will not O. K. the bill, and the prosecuting attorney's office has notified Ryan that the publication is illegal and the notices must be reprinted in the Sumner paper.

"What the Public wants to know is:

"(1) How does it come that a negro publisher has such control of various public officials that he can lead them around by the nose to serve his own selfish ends?

"(2) Was it the purpose of any official involved in the transaction to obtain political 'support' of the negro editor (such as it is) by making an illegitimate payment of county funds?

"(3) Was malfeasance in office committed by any of those involved in taking the publication of the tax list from the Sumner American Standard and giving it to Ryan's Weekly and conniving at legal publications dated June 26 which were in reality issued July 3?

"(4) Just who are the public officials who truckle to the negro editor to such an extent either through fear of his wrath or hope of his support, that they were willing to assist him in an extremely off-color transaction?

"These are all pertinent questions and they merit complete answers. The printing scandal should be fully revealed in all its ramifications. It is not sufficient to know that the illegal bill will not be paid. Those who were in collusion to filch some hundreds of dollars from the county treasury in this sneaking manner should have the light turned upon them."

The complaint then alleges:

"That as a part of the general purpose of the series of wicked, false and malicious publications herein mentioned, and for the purpose of injuring plaintiff in business and reputation, and in the public confidence, and further exposing him to public hatred, contempt and ridicule, defendant in its said evening newspaper of July 19, 1926, published a picture or cartoon, depicting a negro labeled 'Ryan's Weekly,' standing before the open door of a chicken house labeled 'County Printing,' said negro standing in a broad beam of light labeled 'Publicity,' holding a sack in his left hand, a

chicken labeled 'Illegal Tax Notices' falling from his right hand; that said picture was labeled underneath with words following, to wit:

" 'A senegambian caller was noted around the county chicken coop last week!'

"That the defendant meant by said picture or cartoon, that plaintiff had obtained and was attempting to obtain compensation for printing the list of property to be sold by said county for delinquent taxes by methods of stealth, dishonesty, underhandedness, collusion and fraud; that the meaning and intent of said picture was false, wicked and malicious."

A further publication contains the following:

"COUNTY IN UPROAR AT DISCLOSURE

"Efforts of Officials to Rush Publication to Favor Weekly Whose Contract Was Expired Is Bared:

"Sumner Paper Starts Legal Action on Meath's Award.

"County politics were thrown into an uproar yesterday by revelations pointing to grave irregularities in the printing of the summons and notice of delinquency in the county tax foreclosure suits.

"The disclosures so far implicate George M. Meath, county treasurer, a candidate for county commissioner this fall; D. D. Schneider and John H. Binns, deputy prosecuting attorneys and backers of Deputy Howard Carothers, a candidate for prosecuting attorney, and J. H. Ryan, a negro owner of a small weekly and candidate for *for* the Legislature on the Hartley ticket."

Following are quotations of articles published of like tenor and effect, and the complaint then concludes:

"That each and all of said publications were in a series, having the same general purpose; that said publications are false and defamatory and by means thereof the plaintiff has been greatly injured and prejudiced in the public estimation aforesaid, has been exposed to public hatred, contempt and ridicule and obloquy, and has been deprived of and will in future be deprived of gains and profits in his said business to his damage in the sum of fifty thousand dollars."

Issue was joined. The cause came on for trial before a jury. Plaintiff's counsel made an opening statement to the jury and proceeded to offer evidence, whereupon counsel for the defendant objected to the introduction of any testimony upon the ground that the allegations of the complaint were insufficient to charge a cause of action against the defendant. The jury retired, and the objection was fully presented to the trial court. The basis of the objection appears to have been that no special damage being charged in the complaint and general damages only being asked, in order to state a cause of action it must appear that the publications were libelous *per se*.

In ruling on the objection the trial court said:

"As to that part of the article which designates this man as—the plaintiff as a negro, the ruling of the court is that that part of the article is libel *per se,* and insofar as the objection to the introduction of the evidence relating to that part of the article designating the plaintiff as a negro, the objection will be overruled, but that part of the article setting out a history or a comment upon the transactions as they occurred, other than the calling of the plaintiff a negro, the objection will be sustained. You may proceed, gentlemen, with the trial of this case, within the bounds designated by the court's ruling."

It is but fair to the trial court to here state that the record shows that there was before him, when he made this ruling, the fact that, in the opening statement to the jury, counsel for the plaintiff had admitted that the contract for the county printing between Pierce county and Ryan's Weekly expired June 30, 1926; that the issue of Ryan's Weekly dated June 26, 1926, was not issued until July 3, 1926, and that the issue dated July 3 was not issued until July 10, 1926, but how or to what extent these admissions were qualified or sought to be excused does not here appear.

The record is silent as to what occurred after the making of the ruling, save as it inferentially appears that the case was submitted to the jury on the sole issue which the court's ruling held to be actionable, and it does appear that thereafter there was a verdict for the defendant and a judgment entered upon that verdict from which the plaintiff has prosecuted this appeal.

The only error assigned raises squarely the question of the correctness of the trial court's ruling as above set forth.

. The respondent presents and argues some questions which will not be set forth or discussed, because the certificate of the trial court to the statement of facts excludes any possibility of our assuming that something occurred which the record does not show affirmatively to have occurred. The court's certificate reads:

"I, E. D. Hodge, one of the judges of the superior court of the state of Washington, in and for the county of Pierce, and the judge before whom the foregoing case of J. H. Ryan, Plaintiff, vs. Tribune Publishing Company, was heard and tried, do hereby certify that the matters and proceedings embodied in the foregoing statement of facts are matters and proceedings occurring in said cause, and that the same are hereby made a part of the record herein; and I further certify that the said statement of facts contains all the material facts, matters and proceedings heretofore occurring in the cause and not already a part of the record therein which are necessary to a determination of the points involved in the appeal, being all that was said and done on the trial of said cause affecting the action of the court in excluding from the trial and from the jury all evidence of the allegations of the complaint other than those concerning plaintiff's being a negro, but does not contain any evidence taken at the trial."

[1] The sole question then is, whether or not the allegations of the complaint, excluding the charge that

appellant was a negro, state a cause of action. Our statute, Rem. Comp. Stat., § 2424 [P. C. § 8953], provides:

"Every malicious publication by writing, printing, picture, effigy, sign or otherwise than by mere speech, which shall tend:

"(1)   To expose any living person to hatred, contempt, ridicule or obloquy, or to deprive him of the benefit of public confidence or social intercourse; or

"(2)   To expose the memory of one deceased to hatred, contempt, ridicule or obloquy; or

"(3)   To injure any person, corporation or association of persons in his or their business or occupation, shall be libel. Every person who publishes a libel shall be guilty of a gross misdemeanor."

We said in *Wilson v. Sun Publishing Co.,* 85 Wash. 503, 148 Pac. 774, Ann. Cas. 1917B 442:

"Eliminating the statutory element of malice, either actual or implied, an essential only of criminal libel, this definition meets the essentials of libel actionable *per se* as generally recognized in civil actions for damages. Newell, Slander and Libel (2nd ed.), p. 43."

In *General Market Co. v. Post-Intelligencer Co.,* 96 Wash. 575, 165 Pac. 482, we said:

"There are certain words which, when spoken or published of or concerning another, are actionable *per se.* This means that they are actionable without allegation or proof of an actual injury, because their natural, necessary, and proximate consequence is to cause injury to the person of whom they are spoken or published, thus giving rise to a conclusive presumption of law that an actual injury was caused thereby. What words are so actionable is not always easy of determination, and many confusing and conflicting decisions on the question can be found. It is the general consensus of opinion, however, that words are so actionable which charge the commission of a punishable crime, or which tend to injure a person in his occupation, trade, business, or profession. Since appellant

has not, in his complaint, alleged special damages, it must be held, if it is to be held that its complaint states a cause of action, that the words complained of therein are actionable *per se.*"

Did the words used in the publication complained of charge the appellant with the commission of a punishable crime or tend to injure him in his occupation or business? In *Lathrop v. Sundberg,* 55 Wash. 144, 104 Pac. 176, 25 L. R. A. (N. S.) 381, it was held that a publication was libelous *per se* which classed a physician with criminal practitioners, fakirs and quacks. It is there said:

"That the writing is libelous *per se,* it has seemed to us there can be but little question. In order to constitute a civil libel *per se,* it is not necessary that the words published should involve an imputation of crime. It is enough that they be of such a nature that the court can presume, as a matter of law, that they will tend to disgrace the party of whom they are published, or hold him up to public ridicule, or contempt, or cause him to be shunned or avoided. 25 Cyc. 250 *et seq.* The published article in question here tends to do all this, if it does not tend to do more. It carried an insinuation that the appellant is not a reputable physician, or one endeavoring to uphold the honor and dignity of the profession; it classes him with criminal practitioners, patent medicine fakirs, quacks, charlatans, and other fraudulent concerns; it demands his removal from the building in which he has his office, as an undesirable tenant, and demands that in the future he be excluded therefrom. Clearly this is libelous *per se,* if published of and concerning the appellant and he is engaged in a reputable practice, and that it was published of and concerning the appellant and that his practice is reputable, was distinctly alleged in the complaint."

In *Dick v. Northern Pacific R. Co.,* 86 Wash. 211, 150 Pac. 8, Ann. Cas. 1917A 638, it was held that to charge that one had been guilty of intimidating co-employees

would tend to deprive him of public confidence and injure him in his business and vocation and that such a charge was actionable *per se*. To the same effect are the cases of *Reynolds v. Holland,* 46 Wash. 537, 90 Pac. 648; *Cyclohomo Amusement Co. v. Hayward-Larkin Co.,* 93 Wash. 367, 160 Pac. 1051; *Olympia Water Works v. Mottman,* 88 Wash. 694, 153 Pac. 1074, and many other authorities which might be cited.

The trial court and the respondent here seem to place some reliance upon the case of *McClure v. Review Publishing Co.,* 38 Wash. 160, 80 Pac. 303, as laying down a rule that to be actionable *per se* the published words must charge a crime, but in that case the publication complained of was the story of a sensational arrest. There was nothing said as to the business transactions of the person affected thereby and necessarily the sole question there was whether or not a crime was charged. On careful reading, we see nothing in that case out of harmony with the cases which we have already cited. But even so, can we say as a matter of law that the published cartoon with the innuendo as pleaded was not sufficient to go to the jury on the question of whether or not there was an intent to charge a crime. However that question may be answered, we need not and do not rest our decision upon that point, since the moral turpitude involved in the transactions as charged clearly tended to deprive appellant of the benefit of public confidence and to injure him in his business.

Nor is the case of *Wood v. Star Publishing Co.,* 90 Wash. 85, 155 Pac. 400, in point.

"Not only is Wood not named as the person who offered a bribe, but it is no fair inference that the publisher meant as much. Indeed, plaintiff's counsel, conceding a doubt, sums up his case as follows:

" 'The reader may be confused as to just who it

is that should be prosecuted, but he is impressed with the fact that the publisher of the article knows at least one man who was present at the meeting where the bribe was offered, and that that man was Charles B. Wood, and that he had invited Knox, the man to whom the bribe was offered, to the meeting.'

"Nor is bribery charged against anybody, for while the article cries out bribery to begin with, it proceeds to describe the thing that did occur with Knox, which, under our laws, could be no bribery of Knox at all.''

A very different situation from that presented by this case.

The allegations of the complaint, even if considered as amended by the admissions of the opening statement, were sufficient. As already stated, we are not advised as to whether, or to what extent, the admissions were qualified or the delay sought to be excused, but since the law does not presume wrongdoing or fraud, and since the publication of appellant's paper may have been delayed by causes beyond his control, or for purposes which were wholly innocent, it follows that the mere delay, unexplained, does not, as a matter of law, establish that the appellant caused or was responsible for the delay, or that the delay, of itself, establishes the intent and purpose which the publications charge.

We do not go into the question of privilege and of justification, because those are matters of defense and are not presented by the ruling in question.

We are constrained to hold that the complaint stated a cause of action, and the judgment is therefore reversed, and the cause remanded for a new trial on the issues here involved.

Reversed and remanded.

FULLERTON, C. J., MITCHELL, PARKER, and ASKREN, JJ., concur.