[No. 13674. Department Two. October 17, 1917.]

T. P. FAHEY *et al.*, *Appellants*, v. JULIUS SHAFER *et al.*, *Respondents.*[1]

LIBEL AND SLANDER — QUALIFIED PRIVILEGE — MALICE. Objection made by advertisers to the publisher of a paper and to an Ad club, created for the purpose of preventing questionable advertising, to advertisements by competitors which attacked the business of the complaining parties, are qualifiedly privileged, requiring proof of actual malice to sustain a recovery for libel or slander.

SAME—MALICE—EVIDENCE—SUFFICIENCY. In such case, there was not sufficient evidence of malice upon the part of the defendants to take the case to the jury where "upstairs" clothiers were the aggressors in attacking "street-level" clothiers, in advertising charging them with exorbitant charges and questionable business methods and "fake" reduction sales, and the objections by the defendants charging false advertising were argumentative rather than direct, and founded upon an honest suspicion, although there was intemperance of expression.

Appeal from a judgment of the superior court for King county, Jurey, J., entered April 17, 1916, upon granting a nonsuit, dismissing an action for libel. Affirmed.

*John H. Perry* and *O. L. Willett*, for appellants.

*Peters & Powell* (*Arthur Hutchinson*, of counsel), for respondents.

ELLIS, C. J.—In this action plaintiffs, copartners in the retail clothing business, sought to recover damages claimed as the result of certain acts and utterances of defendants, as Seattle Retail Clothiers' Association, which it was charged were done and made in furtherance of a conspiracy to injure plaintiffs' business and destroy their credit.

[1]Reported in 167 Pac. 1118.

Plaintiffs charged, (1) that defendants, on February 17th, 1915, wrongfully and maliciously and by certain detailed false statements, persuaded the Times Printing Company to break an advertising contract with plaintiffs, and for three weeks to refuse to accept advertising from them, and thereafter to accept only censored advertising from them; (2) that, on or about April 1, 1915, defendants, maliciously and without justification and by certain detailed false statements, attempted to persuade and procure the Seattle Ad Club to prosecute plaintiffs for the alleged crime of false advertising; (3) that defendants, about April 1, 1915, by certain detailed false statements and by threats not to trade with certain enumerated wholesale clothing manufacturers, attempted to persuade and prevent such manufacturers from giving credit to or selling goods to plaintiffs. Damages were claimed in the sum of $20,000.

Defendants answered by general and special denials, and alleged, as an affirmative defense, that they themselves were advertisers in the Times newspaper, and that plaintiffs' advertisements therein were to the effect that plaintiffs occupied up-stairs business quarters, comparatively inexpensive, and other merchants in the city occupied expensive ground floor rooms with luxurious and extravagant fixtures involving large rentals, and that plaintiffs were thus able to undersell, and did undersell, such ground floor merchants, who were imposing on the public by charging in the cost of their goods their extravagant rents, so that plaintiffs were able to sell, and were selling, $25 suits for $15, which competition the ground floor clothiers were unable to meet; that defendants interviewed the general manager and the advertising manager of the Times, objected to such advertising, and requested them to look into the matter and correct it in fairness to the defendants; that this was done in good faith without any attempt to injure the plaintiffs or other up-stairs business, and that the statements made to the representatives of the Times were true.

The oral evidence was extremely voluminous and was supplemented by a large number of exhibits. We find it impracticable within the reasonable compass of an opinion more than broadly to notice its salient features. Plaintiffs were doing a men's clothing business on the third floor of the Arcade Building, in Seattle, and were what is known as up-stairs clothing merchants. Defendants were doing the same kind of business at different locations in street level storerooms, and are known as street-level or down stairs clothiers. Most of the latter are members of the Seattle Retail Clothiers' Association, but there was no evidence that such association was formed for the purpose of attacking plaintiffs, or in furtherance of any conspiracy against them or any one else. Its purpose was to promote the legitimate business interests of its members. There was no evidence that plaintiffs could not have become members had they so desired. Plaintiffs had a long time advertising contract with the Seattle Times. Defendants were also advertisers in the same newspaper.

For a considerable time prior to the present controversy, plaintiffs had been running in that paper conspicuous advertisements, samples of which are in evidence, impliedly charging the street-level dealers with adding the expense of their high street-level rents, luxurious outfittings, extravagant fixtures and the like, to the selling price of their goods, and stating that plaintiffs were selling for $15 the same suits sold for $25 in street-level stores, and that, by cutting out exorbitant street-level rents and useless store fronts, plaintiffs were able to do this "every day in the year." Some of these advertisements also, in substance, charged the street-level merchants with advertising "fake" reduction sales, after having asked "two or three profits on each garment during the rest of the year."

The evidence shows that defendants resented these imputations, and that one or two of them threatened to withdraw their own advertisements from the Times if it continued to publish advertisements of the character complained of. It

was finally arranged, on request of Joseph Blethen, the general manager of the Times, that he and J. Fred Braid, its advertising manager, meet with the Retail Clothiers' Association at a luncheon and discuss the matter. Blethen, whose testimony was given in an evident spirit of fairness, testified to the effect that defendants' objection to plaintiffs' advertisements was directed to the continual reference to the fancy store fronts, exorbitant rents, and expensively run stores of the street-level merchants, and to the claim that plaintiffs were selling $25 suits for $15; that some of those present at the luncheon asserted that plaintiffs could not continue in business and pay their bills and sell what are known as $25 suits for $15 continuously; that, if they were doing business that way, sooner or later there would be a crash. He said:

"They made it plain that, in their belief, it could not be done. They slammed the table and said 'they can't do it.' that there must be something Fahey & Brockman were keeping back; that a business carried on in that way could not succeed."

Braid substantially corroborated this version of the conference, and added that somebody made the statement that Fahey & Brockman were a " 'fly-by-night' concern, and that the history of up-stairs stores had been that most of them had gone broke." The result of the conference was that Blethen and Braid agreed to make an investigation, and the president, speaking for the association, stated that the members would be satisfied with whatever conclusion was reached. There was no evidence that, at this meeting, there was any threat of withdrawal of defendants' advertisements or of any coercive measures. Pending the investigation, plaintiffs' advertisements were suspended for a period of about two weeks. Thereafter they were censored, as Blethen testified, in accordance with the general policy of the paper not to permit adverse criticisms of competitors, and the only change made was to require plaintiffs to refrain from specific criticism of ground floor dealers. Plaintiffs were still permitted to exploit their

own economical management and to repeat *ad libitum* the statement that they were selling $25 suits for $15.

The Seattle Ad Club is composed of advertisers and newspaper men and has a "vigilance committee" for the purpose of looking after questionable advertising. It appears that, at the luncheon, Braid suggested that the matter be taken up with the Ad Club, and pointed out the fact that there was a state statute against false advertising. Some of the defendants accordingly took the matter up with the president of the Ad Club and chairman of the "vigilance committee," asking them to investigate plaintiffs' advertisements and take some action. Nothing, however, was done by the club, except to send to plaintiffs a copy of the state law with certain portions underscored. No prosecution was attempted or even seriously considered.

As to the third charge, it appeared that two or three of the defendants did threaten not to deal with certain wholesalers so long as they continued to sell goods to up-stairs merchants who were running the objectionable advertisements. The evidence was uncontradicted, however, that this was not done as the result of any action of the Retail Clothiers' Association and that the association never even considered such a course. There was no evidence that any wholesaler refused to sell to plaintiffs on account of the threatened loss of any of defendants' business, nor was there any evidence that such threats caused any impairment of the plaintiffs' credit with any wholesaler.

The trial court was of the opinion that plaintiffs were the aggressors in the controversy and that defendants were justified in stating their views to Blethen, Braid and the Ad Club and in asking them to investigate. He was also of the opinion that, in so doing, they were acting within the rule of privilege and did not make any unqualified charges of dishonesty against plaintiffs. On these grounds, he granted defendants' motion for a nonsuit. Plaintiffs appealed.

Assuming for the nonce that the communications to Bleth-

en, Braid and the Ad Club, if they had been made under other circumstances, would have been slanderous *per se*, the question is whether they were so under the circumstances here shown, or do they fall within the rule of qualified privilege? That rule may be stated as follows: where a communication is prompted by a duty to the public or to a third person, or is made touching a matter in which the party making it has an interest, to another having a corresponding interest, it is privileged if made in good faith and without malice. Newell, Slander & Libel (2d ed.), p. 391; *Locke v. Bradstreet Co.*, 22 Fed. 771, 773; *Montgomery v. Knox*, 23 Fla. 595, 3 South. 211; *Finlay v. Steele*, 159 Mo. 299, 52 L. R. A. 852; *Dale v. Harris*, 109 Mass. 193; 25 Cyc. 385.

In this state malice is not ordinarily an essential element in the civil action for damages for libel or slander. *Wilson v. Sun Pub. Co.*, 85 Wash. 503, 148 Pac. 774, Ann. Cas. 1917B 442. But this is not true in cases involving the qualified privilege. In such cases, actual malice must be proved before there can be a recovery. This follows from the very nature of the privilege, which in itself is a complete defense in the absence of malice. The burden in such cases is upon the plaintiff to prove the existence of malice. Newell, Slander & Libel (2d ed.), p. 391; *Finlay v. Steele, supra; Dale v. Harris, supra; Coogler v. Rhodes*, 38 Fla. 240, 21 South. 109, 56 Am. St. 170. Whether a statement, if made in good faith and without malice, is privileged is a question for the court. But if there is any evidence reasonably tending to show actual malice, the plaintiff has the right, notwithstanding the privileged character of the communication, to have the question of malicious excess of privilege submitted to the jury upon such evidence. *Fresh v. Cutter*, 73 Md. 87, 20 Atl. 774, 25 Am. St. 575, 10 L. R. A. 67; Newell, Slander & Libel (2d ed.), p. 393. Where the qualified privilege exists and the court can see that the language used will warrant no inference of malice, and there is no other proof of malice, it is the duty of the court to grant a nonsuit. *Liddle v. Hodges*,

15 N. Y. Sup'r Ct. 537; Newell, Slander & Libel. (2d ed.), p. 392.

Applying these principles to the facts and circumstances before us, we are clear that the communications made to Blethen, Braid and the Ad Club were qualifiedly privileged. That respondents had a personal interest in the subject-matter of the communications, there can be no question. Appellants' advertisements were a direct attack upon them and their business methods. They were charged with business extravagance, exorbitant prices, and advertising fake sales. That Blethen and Braid, as manager and advertising agent of the newspaper, also had a peculiar interest in the matter seems equally patent. It was naturally to their interest to treat all patrons of their advertising columns fairly, and that they be given a chance to investigate as to the justice of any ground of complaint and, if possible, remedy it. Blethen testified to the effect that, independently of this controversy and regardless of the truth of the criticisms, it was the policy of his paper not to run advertisements containing specific criticisms of the advertiser's competitors, and that he would have censored appellants' advertisements in that regard without complaint had he noticed them.

A similar mutuality of interest is apparent as to the Ad Club. It was created for the specific purpose of preventing questionable advertising and, to this end, fathered the statute against false advertising. Some of the respondents were members. The evidence indicates little more than that they and other members of the Retail Clothiers' Association suggested that the Ad Club institute a test case to determine whether the up-stairs clothiers were violating the law and, to that end, that the vigilance committee of the club investigate the matter. Some investigation was made, but no action was commenced nor, so far as the record shows, was any action threatened.

The trial court committed no error in holding that, on the established facts, the occasion of the communications and the

relation of the parties to the subject-matter was such as to invoke the rule of qualified privilege.

The next question is, Was there sufficient evidence of malice to take the case to the jury on the question of excess of privilege? We think not. The occasion and circumstances were such that respondents should plainly state what they honestly believed to be true. When it is remembered that appellants were the aggressors and had charged respondents, not by name, indeed, but by designation equally certain, with exorbitant charges, questionable business methods and with advertising "fake" reduction sales, an extreme of temperate statement could hardly be expected. Yet, even so, when fairly considered, respondents' statements meant no more than that, in their belief, appellants could not sell what was known in the trade as $25 suits for $15 and continue long in the business.

"This privilege is not defeated by the mere fact that the communication is made in terms that were intemperate or excessive from over-excitement." *Atwill v. Mackintosh*, 120 Mass. 177.

See, also, *Billings v. Fairbanks*, 139 Mass. 66; *Brow v. Hathaway*, 13 Allen (Mass.) 239; *Fahr v. Hayes*, 50 N. J. L. 275, 13 Atl. 261.

Respondents' statements were clearly argumentative rather than direct and unqualified charges of false advertising. Taken as a whole, they were capable of no other construction. Their conclusions may have been erroneous, and we shall so assume, though the evidence to that effect was far from conclusive. But the mere fact that the conclusion was false, if founded on an honest suspicion, will not defeat the privilege. This is true even in case of unqualified statements: *Billings v. Fairbanks, supra; Piper v. Woolman*, 43 Neb. 280, 61 N. W. 588; *Howland v. Flood*, 160 Mass. 509, 36 N. E. 482. While in these cases the question of malice was submitted to the jury, the offending statements were not argumentative or qualified, as here, but were positive as-

sertions of fact. Yet in each of these cases the court held that proof of falsity alone was not conclusive of malice. Here the statement was not that appellants' advertisements were false in that they were not actually selling $25 suits for $15, but that they could not do so and continue it for long without a crash—clearly a mere expression of opinion. Authority is not wanting that such conditional imputations are not libelous. *Ingalls v. Allen,* 1 Ill. 300; *Mills v. Taylor,* 3 Bibb. (Ky.) 469; *Blackwell v. Smith,* 8 Mo. App. 43. Be that as it may, they were not sufficient to take the case to the jury on the question of malice, through mere proof of the falsity of the conclusion, which is all we have here.

The only thing in evidence touching the communication with Blethen, Braid and the Ad Club which even colorably showed malice was the emphasis and intemperance of the expressions used in making the communications. There was no evidence that these communications in any form were made by respondents to any one else. The intemperance of expression was excusable in view of the provocation found in appellants' advertisements. On the other hand, the charge of malice is negatived by positive testimony. The evidence shows that the whole purpose of the conference with Blethen and Braid was to bring about an investigation by them and secure action on their part founded on such investigation. In fact, the evidence is undisputed that respondents voluntarily agreed to abide by Blethen's decision. The same is true as to the complaint made to the Ad Club. That amounted to little more than a suggestion that the Ad Club make an investigation and, if the facts developed were found to justify it, bring a test suit.

As to the threats made by one or two of the defendants not to trade with certain wholesalers who sold goods to appellants, the evidence wholly fails to show that this was in furtherance or pursuance of any conspiracy. In fact, the positive evidence is that the Retail Clothiers' Association never authorized or even considered such a course. Moreover, there

was no evidence whatever that any one ever refused to sell to appellants on account of such threats, nor any evidence that any communication from any of the respondents caused any impairment of appellants' credit with any wholesaler.

Many questions are raised touching the exclusion of evidence, but in view of the conclusion we have reached on the question of malice, we find it unnecessary to lengthen this opinion—already too long—by discussing them. In some instances there was no sufficient offer, and in no instance was the evidence directed to the question of malice.

Judgment is affirmed.

MOUNT, PARKER, HOLCOMB, and FULLERTON, JJ., concur.