[No. 14551.   Department Two.   April 18, 1918.]

## HARRY P. ECUYER, *Appellant*, v. NEW YORK LIFE INSURANCE COMPANY, *Respondent*.[1]

LIBEL AND SLANDER—SLANDER PER SE—WORDS IMPUTING OFFENSE—INJURY IN BUSINESS. Charges by a life insurance company that its cash clerk had stolen money, made to the clerk's father, and statements to others to whom the clerk subsequently applied for employment that he had been careless in keeping his cash, or was short in his accounts, or that his accounts were not exactly right, thereby preventing his employment, are slanderous *per se*, unless true or privileged, as words importing to him a criminal offense involving moral turpitude for which he might be prosecuted, and as defamatory words prejudicing him in his business or profession.

SAME—TRUTH—QUESTION FOR JURY. In an action against a life insurance company for slander in charging plaintiff, its cash clerk, with stealing money, the truth of the charge is not established, as a matter of law, by proof that he receipted for the money and his cash books and slips showed that he had not accounted for it, but the question is for the jury, where plaintiff denied the charge and any memory of receiving the money and his cash drawer was accessible to other clerks in the common office room, who might have taken the money and cash slips.

SAME—PRIVILEGE—CHARGES MADE TO PARENT. Charges by an insurance auditor that a cash clerk of the insurance company had stolen money, made at an interview with the clerk at which his

[1]Reported in 172 Pac. 359.

father was present by his consent, are only qualifiedly privileged, and the facts not being disputed, the question of privilege is one for the court.

SAME—PRIVILEGE—QUESTION FOR JURY. In such a case, whether the privilege of the occasion was exceeded depends on the good faith of the charges, and is for the jury, where the charge was not confined to the admitted facts that the clerk was short a small sum in his accounts, and it appeared that others in the office might have stolen the money from his cash drawer, and he persistently denied taking the money and refused to repay it; since the charges, under the circumstances, might have been made to coerce the payment.

SAME—PRIVILEGE—BUSINESS REFERENCE. A communication made by the manager of an insurance company, upon a business reference, to another company contemplating the employment of a discharged employee, is one of qualified privilege, which is not exceeded when strictly confined to the facts that such employee had been discharged because short in his accounts and had been at least careless.

SAME—DEFENSE—TRUTH. The truth of a statement that a clerk had been discharged because short in his accounts is a complete defense to a charge of slander, regardless of the question of privilege.

Appeal from a judgment of the superior court for King county, Frater, J., entered August 17, 1917, upon granting a nonsuit, dismissing an action for slander, tried to the court and a jury. Reversed.

*James R. Chambers*, for appellant.

*H. T. Granger (James H. McIntosh*, of counsel), for respondent.

ELLIS, C. J.—This is an action for slander. Defendant, New York Life Insurance Company, has its principal office in New York City. Throughout the United States and Canada it has branch offices. Through these offices new business is written and premiums on current and renewal policies are collected. One A. S. Elford was in charge of the Seattle office and, as inspector of agencies, had general supervision over other branch offices in Oregon, Washington, Montana, Utah, British Columbia and Alberta, Canada. One C. C.

Norton was cashier of the Seattle office. One S. S. Buxton was traveling auditor for the company. It was his business to visit all branch offices, audit and check up their financial operations, accounts and books. Plaintiff, a man twenty-five years of age at the time of the alleged slander, was what is known as the first bonded clerk in the Seattle office. One Sparre was what is known as the second bonded clerk. The principal duty of these two clerks was the collection of premiums. Each had a cash drawer and kept his own cash book. Premium receipts would be forwarded by the home office to the Seattle office for collection. The collections were many, sometimes running as high in volume as ten thousand dollars a day. Plaintiff and Sparre did most of the collecting, though the cashier and what is known as the cash sheet clerk also made collections. When plaintiff or Sparre made a collection, he would countersign the receipt, place the money in his cash drawer, make a memorandum of the collection and attach it to the particular premium card, place this in a drawer or box and from these, later in the day, write up his cash book. Each afternoon the cash was counted to see if it balanced with the cash book, and a cash sheet was made from the cash and the cash books. No one else than plaintiff had a key to plaintiff's cash drawer except the cashier, Norton. There was evidence, however, showing that it was the practice during business hours to leave the keys in the locks of the cash drawers. Sometimes the drawers were not tightly closed, so that it was physically possible for any of the employees to have taken money from plaintiff's cash drawer if so inclined.

On April 11, 1916, Buxton, the traveling auditor, appeared and checked up the Seattle office. He produced two receipts for the premiums, one for $32.30 and one for $4, which were countersigned with plaintiff's name.

Where he procured these receipts does not appear in the evidence. Plaintiff, however, admitted that the signatures were his. The cash book for the day on which these receipts were given showed no corresponding entries. Buxton and Norton called plaintiff's attention to the discrepancy, showed him the receipts, indicated that the money did not appear on the cash book, charged plaintiff with having taken it, and demanded payment. Plaintiff told them that he had no independent memory of making these collections and did not know what became of the money, but positively denied that he took it. The only explanation he gave of failure to make the entries on the cash book was that the collection slips were not attached to the premium cards and that the money was not in the cash box when the cash book was written up for that day. Whether he ever made slips for these collections he had no memory. If he did, what became of them was, and is, wholly unexplained.

After a long conference in which Buxton endeavored to get plaintiff to admit that he had taken the money and urged him to give a list of other sums which Buxton assumed he had taken, Norton suggested that plaintiff have his father, with whom he lived, come to the office and talk the matter over. Plaintiff demurred, Norton insisted, and plaintiff finally consented. Norton thereupon called plaintiff's father by telephone and he came to the office late in the afternoon. The premium receipts and cash book were shown to him, and in the course of the conversation, both Norton and Buxton repeatedly said to him:

"Harry is short in his money. . . . He has been using the company's money. . . . Harry is short in his accounts. . . . He has been taking the company's money. . . . Harry has stolen the money. . . .

Harry has stolen the company's money. . . . What has Harry used this money for that he has taken?''

On plaintiff producing his personal bank book and calling attention to the fact that it showed no abnormal deposits at the time in question, Buxton answered in the father's presence: "If you wanted it bad enough to steal it you would not deposit it." Buxton again, in the presence of the father, asked for a list of the sums he had taken, and said:

"We had a boy in an office that had been stealing money and I asked for a list of the money he had taken so as to save me time. I wish Harry would do the same."

and further

"You go home and think the matter over and give me a list of the other items you have taken."

Plaintiff's father asked if it would seem possible that plaintiff would steal so small an amount. Buxton replied: "O well, that is the way they all start." Plaintiff repeatedly told Buxton that he had taken no money and would make no such list. When asked to pay the money back, plaintiff stated he would not pay it, that he had not taken it, and would just as soon throw it in the bay. Buxton and Norton threatened to notify the bonding company which was surety on plaintiff's bond, and intimated that the surety company would prosecute the plaintiff if he did not pay the money. He still refused. At the close of this interview plaintiff was discharged. He went home with his father, and on the following day the father, as he testified against plaintiff's desires, returned to the office and paid the amount of the shortage.

Later, in the same month of April, 1916, plaintiff applied to Herbert H. Ward, business manager of the Pacific Mutual Insurance Company of California in

the Pacific Northwest, with offices at Portland, Seattle and Tacoma, for employment with that company. Ward testified that he proposed to plaintiff that he, Ward, see Norton of the New York Life Insurance Company as to plaintiff's fitness for the place. To this, plaintiff assented. Ward accordingly called on Norton at the Seattle office, who informed him that the office had been checked up by a traveling auditor who had found things which made it impossible to give plaintiff an unqualified reference. On Norton's suggestion Buxton was called in and stated that plaintiff had been at least careless in his work; that, when he checked plaintiff, there was an item of some thirty-four dollars, more or less, short, and referred to another item of four dollars; that Buxton stated that plaintiff had been careless in his work, had left his keys in the cash drawer containing two or three hundred dollars in cash; that, if a man wanted to steal, that would be one way to do it. He stated that plaintiff was short in his money, also short in his accounts. As a result of the talk, Ward did not employ plaintiff, advising him that he would not do so without a "clean bill of health" from the New York Life Insurance Company.

One G. R. Johnson testified by deposition that, in April, 1916, he was cashier of the New York Life Insurance Company's branch office at Calgary, Alberta, Canada; that, on April 22, 1916, Buxton was auditing that office and spoke to Johnson of plaintiff, saying he was short in his accounts and, in substance, that he had received cash for premiums and did not turn the money into the company nor report it. The witness explained that this was said in connection with advice to Johnson to keep separate cash drawers for himself and for his clerk; that, when Buxton was informed that, in the Calgary office, only one cash drawer was used, he brought up the matter of the shortage in the

Seattle office. On being asked if the information given by Buxton was that plaintiff himself had taken the money, Johnson answered, "His accounts were short, yes, sir. He did not charge it to any of the clerks."

In April and May, 1916, one E. J. Englehardt was cashier of the branch office of the New York Life Insurance Company at Butte, Montana. This office was under the supervision of A.. S. Elford, manager of the Seattle office and inspector of agencies for the northwest. Englehardt testified by deposition that, in April or early in May, 1916, Elford was in the Butte office when the witness had a conversation with him in reference to plaintiff, with whom witness was acquainted. Witness could not recall exactly what was said, but stated that he inferred from what Elford said that plaintiff's accounts were not exactly right. In connection with Englehardt's deposition, a letter from Englehardt to plaintiff was offered, in which Englehardt wrote to plaintiff touching this conversation: "He said you were let out because of a shortage in your accounts."

Plaintiff charged as libelous, (1) the statements made on April 11, 1916, through defendant's agents Norton and Buxton in the presence of plaintiff's father; (2) the statement made on or about April 15, 1916, through defendant's agents Buxton and Norton to Ward, thereby preventing plaintiff from securing employment with Ward's company; (3) the statement made at Butte, Montana, on or about April 22, 1916, through defendant's agent Elford to Englehardt; and (4) the statement made at Alberta, Canada, on or about April 22, 1916, through defendant's agent Buxton to Johnson. He claimed damages in the sum of $60,000.

Defendant in substance answered, (1) that Buxton, on discovering the shortage in plaintiff's accounts, de-

manded that plaintiff make it good; that, on the evening of April 11, 1916, the facts were related in the presence of plaintiff's father, and the statements then made by defendant's representatives were made in good faith, in the honest belief that they were true, and that they were made without malice or intent to injure plaintiff; (2) that the communications made to Ward were privileged, being made in good faith, in the honest belief that they were true, without malice, in strict confidence, and were not volunteered, but were made in response to an inquiry from Ward; (3) that the statements alleged to have been made by Elford and Buxton, subsequent to the conversation of the evening of April 11, 1916, in the Seattle office, were not made by these persons as representatives of defendant or with its authority. Plaintiff, by reply, traversed all affirmative matter in the answer.

The case went to trial to a jury. At the close of the plaintiff's evidence, defendant challenged its sufficiency by motion for nonsuit, which was granted. The action was dismissed, and plaintiff appeals.

In this state we have no statute defining slander generally. We shall not attempt a comprehensive definition of slander as it is recognized at common law. It will suffice here to say that words falsely spoken of a person which impute to him some criminal offense involving moral turpitude for which he, if the charge were true, might be indicted and punished, and defamatory words falsely spoken of a person which in themselves prejudice him in his profession, trade or vocation, are slanderous and actionable *per se*. Newell, Slander & Libel (2d ed.), pp. 38-41. It is obvious, therefore, that all four of the utterances here charged as slanders were slanderous *per se*, unless they were either true or privileged. Appellant contends that neither of them was either true or privileged. Re-

spondent insists that all were true, and all were privileged whether true or not. To avoid confusion we shall consider the first and second charges separately.

I. Was the truth of the first charge established? The truth of the communication is a complete defense to the civil action for libel or slander. But defamatory words are presumed to be false until proven to be true. The onus of such proof lies on the defendant. Odgers, Libel & Slander (3d ed.), p. 192. This matter of defense, as in other cases where a judgment of nonsuit is asked, may be established by the plaintiff's own evidence. The words charged as slanderous in the first communication were proven to have been published by utterance to and in the presence of appellant's father. They were direct, unequivocal and repeated charges that appellant had stolen the money then missing and other unnamed sums. So far as the evidence shows, the whole truth was that the receipts showed that appellant had collected the money and his cash book showed that he had not accounted for it. Had the offending communication been confined to a statement of those facts the evidence, which conclusively established their truth, would have made a complete defense. But it was not so confined. He was charged with stealing the money. That charge was not established by such a degree of proof that any court would be justified in saying that the minds of reasonable men might not differ as to its truth. The question was one for the jury. Appellant denied that he took the money, the key was in the lock of the cash drawer, the room was the common office room of many employees, any one of whom might have taken the money and the corresponding memorandum slips. The evidence was conclusive of appellant's carelessness but not of his dishonesty.

Was the occasion of the first communication privileged, and if so, was there any excess of the privilege?

If privileged at all, it needs neither argument nor citation of authority to show that the privilege was not absolute, but qualified or imperfect. The rule of qualified privilege is this: Where the communication is prompted by a duty to the public or to a third person, or is made touching a matter in which the party making it has an interest to another having a corresponding interest, it is privileged if made in good faith and without malice. *Fahey v. Shafer,* 98 Wash. 517, 167 Pac. 1118. Though malice is the gist of the criminal charge of libel (*State v. Sefrit,* 82 Wash. 520, 144 Pac. 725), it is not ordinarily an essential element in the civil action for slander or libel. *Wilson v. Sun Pub. Co.,* 85 Wash. 503, 148 Pac. 774, Ann. Cas. 1917B 442. But this is not true in cases involving the qualified privilege. In such cases, actual malice must be proved, and the onus of proof is upon the plaintiff. *Fahey v. Shafer, supra.* Where it is not disputed that the words were uttered, the question whether the occasion was privileged is one for the court; whether *bona fides* existed in the statement made or whether it was malicious is usually a question of fact for the jury. *Moore v. Butler,* 48 N. H. 161. This the jury must determine from the language itself and the surrounding circumstances.

"The meaning in law of a privileged communication is that it is made on such an occasion as rebuts the *prima facie* inference of malice arising from the publication of matter prejudicial to the character of the plaintiff, and throws upon him the *onus* of proving malice in fact, but not of proving it by extrinsic evidence only. He has still a right to require that the alleged libel itself shall be submitted to the jury, that they may judge whether there is any evidence of malice on the face of it. . . . The effect, therefore, of showing that the communication was made upon privileged occasion is *prima facie* to rebut the quality or element

of malice, and casts upon the plaintiff the necessity of showing malice in fact,—that is, that the defendant was actuated by ill will in what he did and said, with a design to causelessly or wantonly injure the plaintiff,—and this malice in fact, resting, as it must, upon the libelous matter itself, and the surrounding circumstances tending to prove fact and motive, is a question to be determined by the jury. The question whether the occasion is such as to rebut the inference of malice if the communication be *bona fide* is one of law for the court; but whether *bona fides* exist is one of fact for the jury." *Bacon v. Michigan Cent. R. Co.*, 66 Mich. 166, 33 N. W. 181.

See, also, *Nichols v. Eaton,* 110 Iowa 509, 81 N. W. 792, 80 Am. St. 319, 47 L. R. A. 483; *Fresh v. Cutter,* 73 Md. 87, 20 Atl. 774, 25 Am. St. 575, 10 L. R. A. 67; *Abraham v. Baldwin,* 52 Fla. 151, 42 South. 591, 10 L. R. A. (N. S.) 1051; *Brow v. Hathaway,* 13 Allen (Mass.) 239.

In the record before us, there is no dispute as to the fact of the father's presence when the offending words were spoken, nor as to why he was there. The question of privilege was, therefore, one for the court. It is generally held that communications made to, or in the presence of, a parent of a minor touching the minor's conduct, by reason of the parent's interest, are qualifiedly privileged if made fairly and in good faith. This is especially true if the interview be sought by the parent. *Long v. Peters,* 47 Iowa 239; *Moore v. Butler, supra.* The same rule has been applied, and we think soundly, where the child, though an adult, is a female living with and under the care and protection of the parent. *Rosenbaum v. Roche,* 46 Tex. Civ. App. 237, 101 S. W. 1164. In other cases, except where the communication was invited or acquiesced in by the traduced person himself, it is no more privileged when made to parents or other kindred than if made to strangers.

9—101 wash.

*Miller v. Johnson,* 79 Ill. 58; *Davis v. State,* 74 Tex. Cr. 298, 167 S. W. 1108, L. R. A. 1915A 572; *Thorn v. Moser,* 1 Denio (N. Y.) 488; *Rose v. Imperial Engine Co.,* 110 App. Div. 437, 96 N. Y. Supp. 808. But where the interview in the presence of others was either invited or consented to by the person claiming to have been defamed, the occasion is qualifiedly privileged whether such persons be strangers or kindred. *Christopher v. Akin,* 214 Mass. 332, 101 N. E. 971, 46 L. R. A. (N. S.) 104, and note. Appellant did not invite his father's presence at the interview in respondent's office but he consented to it, reluctantly it is true, but without coercion. He was a man of full age and intelligence. His consent must be held voluntary. We think the occasion was one of qualified privilege, and so hold.

Whether the privilege of the occasion was exceeded depends upon the good faith of the charges made. This, as we have shown, is to be determined from the character of those charges in the light of all of the known circumstances. Had the charge been confined to the admitted facts with the legitimate deduction that he was short in his accounts, we would be able to say, as a matter of law, that the communication was not in excess of the privilege. But inasmuch as these facts were explicable on another hypothesis than that appellant stole the money, others in the office having at least potential access to his cash drawer, and in view of the further fact that he persistently denied having taken the money himself, we cannot say, as a matter of law, that the direct unqualified charges of larceny, not only of this but of other money, repeatedly made, was not in excess of the privilege of the occasion. If the charges of theft were made under an honest suspicion that appellant had stolen the money, the privilege of the occasion was not exceeded, but if they were made to coerce payment by the father, or with any

other sinister purpose, the privilege was exceeded. "This is not a lawful method of collecting a debt or of compelling another person than the debtor to pay it." *Beals v. Thompson*, 149 Mass. 405, 21 N. E. 959. Either of these inferences might be drawn by the jury from the facts. The question of malicious excess of privilege was, under the evidence before us, one for the jury under proper instruction.

II. The occasion of the communication to Ward was clearly one of qualified privilege. Appellant had applied to Ward for employment. Ward had an interest which prompted him to inquire of appellant's former employer as to his fitness for the employment. Statements made under such circumstances are universally held to be qualifiedly privileged. We have carefully considered the evidence touching the communication made to Ward by respondent's agents Buxton and Norton. We are satisfied that the privilege was not exceeded. They stated the facts truthfully and said that appellant had been at least careless. There is no evidence that they directly charged appellant with theft or that the words used were designedly capable of that construction, however Ward may have construed them.

III. The other two communications charged in the complaint as slanderous fall in the same category. We find it unnecessary to determine whether either of them was privileged or not. The evidence shows that the statement made by Buxton to Johnson at Calgary was made by way of caution and to illustrate the advisability of having an individual cash drawer for each collector. The statement went no further than that appellant was short in his accounts and that none of the clerks was charged with the theft. The evidence of the statement to Englehardt made by Elford at Butte was extremely vague; but even assuming that

it was precisely what Englehardt wrote to appellant; viz., "He said you were let out because of a shortage in your accounts," it was confined to the exact truth. As we have seen, the truth of the offending statement is a complete defense regardless of the question of privilege.

The judgment is reversed, and the cause is remanded for a new trial in accordance with this opinion.

CHADWICK and HOLCOMB, JJ., concur.