331 So.2d 558 (1976)
Van H. ALFORD, Plaintiff-Appellant,
v.
GEORGIA-PACIFIC CORPORATION, Defendant-Appellee.
No. 10651.
Court of Appeal of Louisiana, First Circuit.
April 12, 1976.
Rehearing Denied May 24, 1976.
Writ Refused July 1, 1976.
Leo J. Berggreen, Baton Rouge, for plaintiff-appellant.
John Dale Powers, Baton Rouge, for defendant-appellee.
Before LANDRY, SARTAIN and EDWARDS, JJ.
*559 SARTAIN, Judge.
This is a suit for defamation instituted by plaintiff, Van H. Alford, against his former employer, Georgia-Pacific Corporation, for statements that agents of defendant Georgia-Pacific allegedly made to plaintiff's inquiring prospective employers. The case was originally tried before a jury which returned judgment in favor of plaintiff. Subsequently, motion for new trial was granted on grounds that the verdict was contrary to the evidence. The case was reassigned to another division where pursuant to stipulation by counsel the case was submitted on the basis of the transcript of the original trial. The trial judge therein rendered judgment in favor of defendant dismissing plaintiff's claim and thus prompting plaintiff's appeal. We affirm.
We have carefully reviewed the record before us and adopt the following statement of facts found in the learned trial judge's written reasons for judgment as our own:
"Plaintiff was hired by Georgia-Pacific as an electrical engineer in the year 1970. The contract of employment was verbal and terminable at will by either party. On November 5, 1973, defendant unilaterally terminated Alford's employment. Although no reason for discharge was logged in defendant's personnel file, the defendant's personnel manager, John D. Taylor, verbally indicated that plaintiff had trouble motivating and working with people in the field.
"Subsequent to his discharge, plaintiff applied for several positions with other local concerns. In the process of reviewing the plaintiff's employment history, these prospective employers would contact Georgia-Pacific to obtain a work performance evaluation. In the course of the conversation, defendant's agent(s) stated that plaintiff was a good draftsman, a good engineer on the board, but had trouble `pushing a crew.'
"Plaintiff avers that over the past fifteen years he has enjoyed an outstanding reputation as an electrical engineer. As far as he is concerned, no official reason was ever given for his discharge. Alford further contends that the statements made by agents of the defendant company were knowingly false, but nevertheless made to discredit his character and reputation. Plaintiff alleges that as a result of his arbitrary and capricious discharge by defendant and the subsequent malicious statements, he has suffered a loss of standing in the community, embarrassment and humiliation, damage to his professional reputation, mental anguish, and loss of future earnings.
"Defendant vehemently denies plaintiff's allegations, taking the position that the statements made by its employees were neither false nor malicious. The resolution of these contentions requires a summary of the relevant evidence adduced at trial.
"John D. Taylor, defendant's personnel manager, testified on cross examination that he had talked for several minutes on the telephone with Mr. C. Z. Breaux of Dyer and Moody, Inc., around the first of the year, 1974. Breaux inquired about plaintiff's employment history with Georgia-Pacific. In response, Taylor told Breaux that plaintiff was a good draftsman, a `good engineer on the board' but was unable to `push a crew' or a contractor (Tr. p. 23). Taylor explained that an electrical engineer at defendant's plant was required to do both drafting and supervision. The same information was also communicated to Mr. Thomas N. Samuel, personnel director with Dixie Electric Membership Corporation (Tr. p. 33).
"Taylor stated that his conclusions relative to plaintiff's attributes and shortcomings were based on both personal observations and opinions expressed by other supervisors and employees (Tr. pp. 26-28).
"Taylor further testified on direct examination that Alford was both cooperative and polite, but that he was more of a follower *560 than a leader. When prospective employers called for a recommendation he gave what he thought to be an honest one. He further stated that he was not out to get or hurt Alford in any way (Tr. pp. 359-361).
"Wayne Stonecypher, the assistant personnel manager at Georgia-Pacific, testified on cross examination that he received a call from Mr. Robert Couvillion of Rust Engineering Company concerning a recommendation for Alford. Stonecypher informed Couvillion that he did not have the authority to discuss the matter.
"Earnest R. Clifton, Jr., director of the engineering and maintenance department, testified that he was Alford's supervisor at Georgia-Pacific. Clifton talked to approximately six individuals requesting a recommendation for the plaintiff. He told each one that `Mr. Alford was a qualified electrical engineer, that I did not feel that he was a field man and could not work in the field and that I did not feel that he could supervise people . . . that if I had a job . . . for his qualifications where he would not have to deal with people or work people that I would not hesitate to hire him in that job' (Tr. pp. 377-378). Clifton further testified that he had nothing personal against Alford, nor was he trying to harm him in any way. He did not consider his recommendations to be derragatory (sic) or untruthful (Tr. p. 377).
"Robert Couvillion, an electrical engineer with Rust Engineering Company, testified that he had a personal interview with plaintiff for possible employment) in November of 1973. He attempted to contact the personnel manager at Georgia-Pacific for a recommendation, but was unable to reach him. Couvillion testified that Alford was not hired because, in his opinion, he did not meet qualifications for strong technical administrative leadership ability (Tr. p. 72).
"William D. Kimbro, with Parker and Baker Employment Agency, testified that plaintiff came to see him about finding a job in December of 1973. He spoke with Mr. Clifton about plaintiff's qualifications and was told that plaintiff was an excellent engineer, `a engineer's engineer.' He was also told that Alford was not considered to be good management material because of a problem in communicating with the people doing the work. Kimbro further testified that he was very favorably impressed with plaintiff's qualifications after his discussion with Clifton (Tr. pp. 79-80).
"Jerry Smith, formerly an employment counselor with Snelling and Snelling, testified that he placed Alford with a consulting engineering firm. He stated that he wrote defendant for personnel data on plaintiff's past employment but received no reply. (Tr. p. 90).
"C. Z. Breaux, Jr., with Dyer and Moody, Consulting Engineers, interviewed Alford for possible employment in November of 1973. Breaux contacted John Taylor of Georgia-Pacific for reference purposes. During the conversation which lasted several minutes, Breaux was informed that Alford had `very good engineering capabilities; and that he was quite competent and capable on the board. In addition, Taylor indicated that Alford was lacking some of the qualities in relation to field work (Tr. p. 164). Breaux further testified that he considered Taylor's recommendation to be very good and complimentary with respect to plaintiff's engineering capabilities. He also stated that the conversation with Taylor was one, but not the sole factor associated with his decision not to hire Alford. (Tr. p. 166).
"G. R. Worley, who has been plaintiff's supervision at Dow Chemical Corporation in 1966, testified as an expert in the field of mechanical engineering. He stated that in his opinion Alford was very competent as a pure engineer. Although plaintiff was a good design engineer, he had problems communicating and working with people in the field. His opinion was based *561 on personal observation and written reports from other supervisors. (Tr. pp. 271, 276).
"Thomas N. Sammel, personnel manager with Dixie Electric Membership Corporation, testified that Mr. Taylor gave plaintiff a good recommendation as a drafting board engineer who, however, could not work well with people in the field. Sammel further testified that this evaluation did not have a bearing on his decision not to hire Alford. Apparently, plaintiff lacked the qualification and experience for a utility engineerthe position to be filled (Tr. p. 280-282).
"Don R. Calhoun, a general mechanic with Georgia-Pacific, testified that on several occasions he worked with plaintiff. He testified that Alford was a `real good engineer on a thing dealing with the drawing board.' However, Calhoun was also of the opinion that plaintiff was not `forceful enough to get work out of people.' (Tr. pp. 315-316).
"Ralph Ellis, formerly a plant engineer with Georgia-Pacific, testified that he discussed plaintiff's job performance with Ernest Clifton. These discussions concerned Alford's ability to communicate with the hourly-employees in relation to field work. Ellis characterized plaintiff's problem as a lack of aggressiveness (Tr. p. 342). Ellis further testified that he attempted to work around Alford's problem (Tr. p. 353).
"John Kirschenbaum, mechanical engineer with Georgia-Pacific, testified that plaintiff was a nice person, but had difficulty communicating with the hourly employees (Tr. p. 389).
"Dr. Roger L. Burford, professor of quantitative methods, proposed a statement of plaintiff's projected future earnings for purposes of the trial. Dr. Burford projected Alford's future earnings to be $423,865.00, assuming a discount factor of five per cent, an annual rate of growth of four and one-half per cent, and a work expectancy of 20.3 years. This figure is based on the premise that plaintiff will never work again.
"Dr. Vincent Cangelosi, a professor and part owner of a consulting and research firm, calculated the liklihood (sic) of plaintiff's re-employability in the engineering field to be over ninety-nine per cent in the Baton Rouge area.
"Dr. Thomas T. Stigall, a clinical psychologist, performed various tests to determine plaintiff's psychological status for trial purposes. Dr. Stigall concluded that plaintiff appeared to have no psychological disabilities or disorders. The doctor further stated that Alford exhibited some signs of mild anxiety and depression, but that these symptoms were only situational.
"Plaintiff, testifying on his own behalf, stated that he was never told why he had been discharged (Tr. p. 120). Alford further testified on cross examination that he really doesn't think anyone at Georgia-Pacific is `out to get him' (Tr. pp. 146-147). To the best of his knowledge he was never called down for doing his work improperly (Tr. p. 158)."
Citing Sas Jaworsky v. Padfield, 211 So.2d 122 (La.App. 3rd Cir., 1968), setting forth the elements of proof necessary to make words actionable under law, the trial judge concluded that plaintiff had not shown the words said about him to be false, nor did he show any malice on the part of defendant.
While we are inclined to agree with these determinations made by the trial judge, we need not definitively pass on them since we conclude these communications between plaintiff's former employer and prospective employers enjoy a conditional or qualified privilege. As such, the words are not actionable when made in good faith for legitimate purposes.
Although the question of a conditional privilege attaching to statements made by a former employer to an inquiring prospective employer seems to be res nova *562 in Louisiana, the doctrine finds ample support in other jurisdictions. See Ecuyer v. New York Life Ins. Co., 101 Wash. 247, 172 P. 359 (1918); Childs v. Erhard, 226 Mass. 454, 115 N.E. 924 (1917); Edwards v. James Stewart & Co., 82 U.S.App.D.C. 123, 160 F.2d 935 (1947); Burns v. Barry, 353 Mass. 115, 228 N.E.2d 728 (1967); Duncantell v. Universal Life Insurance Company, 446 S.W.2d 934 (Tex.App. 14th Dist., 1969). We note the following language found in 50 Am.Jur.2d § 273 at page 791:
"It is an established general rule that a communication respecting the character of an employee or former employee is qualifiedly privileged if made in good faith by a person having a duty in the premises to one who has a definite interest therein, and this is true even though the communication contains a charge of crime. So long as good faith is present, the person making the statement is not limited to facts that are within his personal knowledge, but may, and should, pass on to his inquirer all relevant information that has come to him, regardless of whether he believes it to be true or not."
Furthermore, the communication with respect to the character and qualifications of a former employee "may be made to any person who has a legitimate interest in the subject matter thereof, such as a prospective employer, . . ." 50 Am.Jur.2d § 275, p. 793. (emphasis ours) See also 53 C.J.S. Libel and Slander § 107.
The reason for this privilege is evident and is well enunciated by the Supreme Court of Rhode Island in Swanson v. Spiedel Corporation, 110 R.I. 335, 293 A.2d 307 (1972) at page 310, wherein the court states:
"We believe that the public interest requires that the protection of the privilege be accorded to a communication by a former employer to a prospective employer with regard to a former employee's work characteristics where the publisher acts in good faith and has reason to believe that to speak out is necessary to protect ` * * * his own interests, or those of third persons, or certain interests of the public.' By giving such information in good faith to other employers protects the publisher's own interests by insuring that he may seek and receive the same information when about to hire new employees."
We feel that it would be an undue burden to place on employers and would hopelessly hinder the free exchange of opinion between them if the law did not afford some form of protection. To hold otherwise would either tend to stifle communication of qualification and character evaluations, inherently subjective in nature, or alternatively, would breed deception in its wake. This we cannot condone as we feel community and societal interest dictate otherwise.
Of course, such privilege is not absolute, and as such, necessarily has its limits. It can be abused. Prosser, in his treatise Law of Torts, Chapter 19, § 115, points out that such privilege will be lost if published by a defendant in the wrong state of mind. While published with "malice" is the term often used to denote cases of abused privilege, Prosser points out that this is somewhat of a misnomer. Rather, citing Restatement of Torts, § 603 as his authority, he states that the privilege should be lost if the publication is not made primarily for the purposes of furthering the interest which is entitled to protection.
In the instant case, defendant's employees communicated with prospective employers in good faith an honest evaluation of plaintiff in the interest that they in the future should receive the same if it were requested. We find no other motive, either express or by implication. Thus, we find no abuse by defendant of its conditional privilege in discussing plaintiff's *563 character and qualifications insofar as they reflect on his duties as an employee, with those who had a legitimate interest therein.
Accordingly, for the above and foregoing reasons, the decision of the trial court is affirmed. Plaintiff-appellant is cast for all costs of these proceedings.
AFFIRMED.