[No. 44588. En Banc. April 21, 1977.]

NEIL H. TWELKER, *Appellant,* v. SHANNON & WILSON, INC., ET AL, *Respondents.*

*Inslee, Best, Chapin & Doëzie, P.S.,* by *Evan E. Inslee* and *Michael M. Fleming,* for appellant.

*Lane, Powell, Moss & Miller* and *Robert W. Thomas,* for respondents.

UTTER, J.—Neil H. Twelker, appellant, brought suit against L. Keith Bestwick and his employer, Shannon & Wilson, Inc., respondents herein, alleging defamation of his professional reputation. Respondents moved for a summary judgment of dismissal which was granted by the trial court. The issue presented on appeal is whether the defense of either absolute or qualified privilege has been established by respondents as a matter of law. We hold neither defense has been established and reverse the judgment of dismissal.

Appellant is a soils engineer and sole proprietor of Neil Twelker & Associates, a firm involved in soils investigation and consultation for engineering projects. L. Keith Bestwick is also a soils engineer and his employer, Shannon & Wilson, Inc., is a competitor in the soils engineering field. Appellant claims he was defamed by virtue of the publication of a letter from respondents directed to United Pacific Insurance Company. The letter (see Appendix) was directed to the cause of a landslide which had taken place in 1973 and which damaged a building completed 2 months earlier. United Pacific insured the general contractor in charge of the construction of that building and appellant prepared the soils report for the project. Apparently concerned with the possible exposure to liability of its insured, United Pacific retained the respondent to investigate the slide and issue a statement of its findings with regard to its cause. A 3–page report prepared pursuant to that request and forwarded to the insurance company contains the statements here alleged to have defamed appellant. The only persons who saw the report until it was turned over to other counsel after appellant was joined in the lawsuit against the contractor, were the insurer's claims personnel

and an attorney retained to represent that company's insured, the general contractor.

Respondent Bestwick prepared his letter following two inspections of the landslide site and a review of various documents, including the appellant's soil report, which were pertinent to the construction project. Appellant contends the letter contains several specific false statements regarding the contents of the original soil report, and that those statements concerning the report were made with knowledge of or reckless disregard for their falsity. For purposes of its motion for summary judgment, respondent has admitted the challenged statements were in fact false, but contends that he had either a qualified or absolute privilege to make such false statements, which privilege was not abused. Appellant asserts the affidavits and depositions made a part of the record raise factual issues as to abuse of privilege sufficient to withstand a motion for summary judgment.

■ The defense of absolute privilege applies to statements made in the course of judicial proceedings and avoids all liability. *Gold Seal Chinchillas, Inc. v. State*, 69 Wn.2d 828, 830, 420 P.2d 698 (1966). "A witness is absolutely privileged to publish false and defamatory matter of another in communications preliminary to a proposed judicial proceeding and as a part of a judicial proceeding in which he is testifying, if it has some relation thereto." Restatement of Torts § 588, at 233 (1938). Comment *a* to that section of the Restatement sets forth the reasons behind the rule:

> The function of witnesses is of fundamental importance in the administration of justice. The final judgment of the tribunal must be based upon the facts as shown by their testimony, and it is necessary therefore that a full disclosure be not hampered by fear of private suits for defamation. The compulsory attendance of all witnesses in judicial proceedings makes the protection thus accorded the more necessary. The witness is subject to

the control of the trial judge in the exercise of the privilege. For abuse of it, he may be subject to criminal prosecution for perjury and to punishment for contempt.

The doctrine of privileged communication is founded on public policy considerations. The prime consideration justifying the application of the defense of absolute privilege to certain occasions is the need of free speech to prevail over the right to preserve one's reputation. Absolute privilege is usually confined to cases in which the public service and administration of justice require complete immunity. Legislatures in debate, judges and attorneys in preparation or trial of cases and executive or military personnel, when within the duties of their offices, are frequently cited examples. In such situations the utterances or publications of such individuals, even though false or malicious, are protected. *Gold Seal Chinchillas, Inc. v. State, supra; Mills v. Denny,* 245 Iowa 584, 63 N.W.2d 222, 40 A.L.R.2d 933 (1954). The promotion of public welfare by allowing prospective witnesses to discuss their views of a potential lawsuit without fear of suit for defamation is argued here as the basis for extending the doctrine of absolute privilege so as to encompass the situation before us.

The reason, however, for granting absolute immunity is not free speech or public welfare alone. In addition, the scope of absolute privilege has traditionally been limited to situations in which authorities have the power to discipline as well as strike from the record statements which exceed the bounds of permissible conduct.

Absolute immunity, it seems, should be confined to cases where there is supervision and control by other authorities, such as courts of justice, where proceedings are under the able and controlling influence of a learned judge, who may reprimand, fine and punish as well as expunge from records statements of those who exceed proper bounds, and who may themselves be disciplined when necessary. The same is true in federal and state legislatures, and their committees, where the decorum is under the watchful eye of presiding officers, and records may be stricken and the offending member

punished. . . . Underlying the doctrine of absolute immunity is the concept of an alternate if not adequate remedy. . . . [A]bsolute immunity in defamation matters presents a conflict between two American principles equally regarded in the law, i. e., the right of an individual on one hand to enjoy his reputation unimpaired by defamation attacks, and on the other hand the necessity in the public interest of a free and full disclosure of facts in the conduct of the Legislative, Executive and Judicial Departments of Government. 9 Columbia Law Review 463, 471.

*Mills v. Denny, supra* at 588–89.

In *Kenny v. Cleary,* 47 App. Div. 2d 531, 363 N.Y.S.2d 606 (1975), the defense of absolute privilege was raised as to several allegedly defamatory statements made prior to and during the course of a judicial proceeding. The court refused to grant an absolute privilege to statements made before the commencement of judicial proceedings but did allow the defense of qualified privilege as to certain statements, one of which was made by a client to his attorney and the others made by an attorney for a stockholder to other stockholders in the same company.

In *Middlesex Concrete Prods. & Excavating Corp. v. Carteret Indus. Ass'n,* 68 N.J. Super. 85, 91, 172 A.2d 22 (1961), the defendant claimed the defense of absolute privilege to defamatory statements made by him as a consultant to clients who requested an opinion from him in a matter in which a lawsuit had already been filed. The court allowed the claim of absolute privilege and noted that "statements made in judicial or *quasi*-judicial proceedings and having some relation thereto are absolutely privileged against a suit for defamation." The court concluded that, at page 92:

[W]hat was done by Streander and his employees was related to the suit. The investigation, report, consultations, aid and advice were pertinent and relevant to the litigation as preliminary steps in the defense of the case and a part of the preparation for the actual trial. As such, they are part of a judicial proceeding and within the privilege or immunity stated.

If this were not so, every expert who acts as a consultant for a client with reference to proposed or actual litigation, and thereafter appears as an expert witness, would be liable to suit at the hands of his client's adversary on the theory that while the expert's testimony was privileged, his preliminary conferences with and reports to his client were not, and could form the basis of a suit for tortious interference.

The extraordinary breadth of absolute privilege seems to us to require some compelling public policy justification for its existence. Where a lawsuit has been filed, the court in *Middlesex* found the need for uninhibited preliminary conferences and reports sufficient to establish such a justification. Respondent has cited no case where absolute privilege has been extended to statements made prior to the initiation of a lawsuit nor has he presented public policy arguments of such a compelling nature as to justify such an extension. In the absence of such arguments we decline to apply the absolute privilege accorded statements made in the course of or preliminary to judicial proceedings to the circumstances of this case.

 The defense of qualified privilege has been the subject of extensive comment by this court.

On certain occasions one is qualifiedly or conditionally privileged to publish false and defamatory matter of another and is not liable therefor, provided such privilege is not abused. Facts contained in such communication need not be true, if published without malice, in good faith, and in an honest belief of their truth arrived at after a fair and impartial investigation or upon reasonable grounds for such belief. 3 Restatement of the Law of Torts 241 to 260, §§ 593 to 598. These occasions arise when the publication is for the protection of the interest of the publisher, *Fahey v. Shafer*, 98 Wash. 517, 167 Pac. 1118; the recipient or a third person, *Ecuyer v. New York Life Ins. Co.*, 101 Wash. 247, 172 Pac. 359; persons sharing a common interest, *Chambers v. Leiser*, 43 Wash. 285, 86 Pac. 627; *Ward v. Painters' Local Union*, 41 Wn. (2d) 859, 252 P. (2d) 253; family relationships, *Kimble v. Kimble*, 14 Wash. 369, 44 Pac. 866; public interest,

*Stevens v. Haering's Grocetorium,* 125 Wash. 404, 216 Pac. 870.

*Owens v. Scott Publishing Co.,* 46 Wn.2d 666, 674, 284 P.2d 296 (1955).

Once the existence of such a conditionally privileged occasion is established by the defendant, the burden of proof to show abuse of the privilege shifts to the plaintiff. *Ward v. Painters' Local 300,* 41 Wn.2d 859, 252 P.2d 253 (1953). The parties do not dispute the fact that the statements made by respondent in this case are qualifiedly privileged under the law as stated in *Owens* and the Restatement of Torts § 595. It is appellant's contention, however, that the pleadings, exhibits, affidavits and depositions before the trial judge on motion for summary judgment raise questions of fact as to the abuse of the privilege, sufficient to preclude dismissal of the action at this stage.

█ Summary judgment may be granted in those instances in which there is shown to be no genuine issue as to a material fact and the moving party is found to be entitled to judgment as a matter of law. CR 56(c). The burden of proving, by uncontroverted evidence, the nonexistence of a genuine issue is upon the moving party. Pleadings alone are not sufficient to establish an issue of material fact where, as here, the motion is supported by evidentiary material. In such a situation the adverse party must set forth specific facts showing the existence of a genuine issue for trial. *LaPlante v. State,* 85 Wn.2d 154, 531 P.2d 299 (1975).

Our examination of the record satisfies us that the appellant has met the limited burden of presenting specific facts creating a genuine issue as to the question of whether the respondent Bestwick's statements were made after a fair and impartial investigation or upon reasonable grounds for belief in their truth. The record contains an affidavit by an independent expert in the field of soils engineering, submitted on behalf of the appellant, which states unequivocally that the details which the respondent claimed were omitted from the Twelker report were in fact included. The affidavit further asserts that the limited site investigation

conducted by the respondent without performing independent subsurface tests was not sufficient to allow Bestwick to form an opinion as to the sufficiency of the Twelker report. This affidavit raises factual questions as to the fairness and impartiality of respondent's investigation as well as the existence of reasonable grounds for his expressed beliefs. Respondent's qualified privilege could be lost if the finder of fact concluded that the challenged statements were made in the absence of an adequate investigation or reasonable belief in their truth. *Owens v. Scott Publishing Co., supra.*

The aforementioned affidavit, coupled with the other evidence presented to the trial court, created a question of fact as to the abuse of qualified privilege and a genuine issue of fact has been presented by the appellant. We therefore conclude the trial court erred in granting respondents' motion for summary judgment. The judgment is reversed and the case remanded for trial on the merits.

WRIGHT, C.J., and ROSELLINI, HAMILTON, STAFFORD, BRACHTENBACH, HOROWITZ, DOLLIVER, and HICKS, JJ., concur.

APPENDIX

SHANNON & WILSON, INC.
Soil Mechanics and Foundation Engineers
1105 North 38th Street, Seattle, Washington 98103
Telephone (206) 632–8020

June 13, 1973

Mr. Ed Enerson
United Pacific Insurance Company
Room 300 – Denny Bldg.
2200 Sixth Avenue
Seattle, Wa 98121

Re: Red Dot Corp. Landslide
7000 Highland Park Way SW,
Seattle

Dear Mr. Enerson:

This is to report on my inspections of the subject post–construction landslide and a review of certain documents concerned with site con-

ditions and the landslide. The first inspection was made on April 3, 1973 in the company of Mr. Ron McFarlane, General Manager of the Red Dot Corp. While in the area again on April 26th I walked over the · landslide area south of the Red Dot building.

Documents reviewed were from your file and consisted of:

1. Soils and Foundation Investigation Report, Proposed Addition to Manufacturing Facility, November 10, 1971, by Neil H. Twelker & Associates.
2. May 9, 1972 Site Preparation Letter to H. W. Hill Construction Co. from Neil Twelker & Associates.
3. January 15, 1973 letter to Red Dot Heater Corp. from H. W. Hill Construction Co. regarding inspection of landslide, discussions with John Klima of Joseph Millegan & Associates, Project Consulting Engineers, Neil Twelker and others.
4. January 16, 1973 letter to H. W. Hill Construction Co. from Neil Twelker & Associates regarding slide inspection.
5. January 25, 1973 letter to Neil Twelker from Ron McFarlane, Red Dot Corp. regarding project consultations and responsibilities.
6. January 25, 1973 letter to Joseph Millegan & Associates from Ron McFarlane regarding project consultations and responsibilities.
7. February 27, 1973 Memorandum File by you.
8. March 8, 1973 letter to Red Dot Corp. from Joseph Millegan & Associates regarding their consultations and structural advice during the landsliding period.

As I understand, the sliding occurred several months following a toe-of-slope excavation and completion of the westerly extension of the Red Dot Corp. manufacturing plant at 7000 Highland Park Way SW, Seattle. The 1971 Twelker report notes that a slide condition developed on this same slope during excavation for the first building and was stabilized by a buttress fill. Consequently the report provides construction procedures for excavating and buttress filling for the east end of the building extension. However, it turned out that sliding took place in the more granular soils on the west end instead of in the moderately stiff silty sandy clay in the east end.

You have asked that we comment on and offer opinions regarding the landslide. We will attempt to do so in this report however, information needed to make a comprehensive study as a basis for such opinions is not available. In our opinion the following is pertinent to such a study.

1. Detailed boring logs providing information on sampling procedures, groundwater level, moisture content and denseness and consistency of soils. The soil report contains no such boring logs.

2. Laboratory of field testing to determine soil strength. No test results are presented in the soil report.
3. Results of a slope reconnaissance to determine whether older slides are present. The soil report does not make note of such a survey. We are of the opinion that the hillside to the south has experienced previous (other than the sliding that occurred when the original Red Dot building was constructed) sliding and surface creeping.

Without the benefit of detailed stability studies, and based upon my visual examination of the slide evidence adjacent to the south side of the new building extension, it is my opinion that no excavation should have been made into the slope without plans for buttress filling or the construction of a rather massive retaining wall. Buttress filling would have been particularly important for slope excavating during wet periods when soils are normally saturated and groundwater at the highest levels. Either a buttress fill or retaining wall would have required soil strength testing and engineering studies for design.

I understand the slope excavation and building construction was completed during the more dry summer and fall months of 1972. Sliding on the south side began about January 10, 1973 during a period of reported heavy rain. From the documents reviewed, I gather that the lower section of the south building wall was designed to withstand the load imposed by 12 feet of granular fill. In my opinion, the wall should have been designed to accommodate full height not only any granular fill but also the loads imposed by an unstable and saturated adjacent slope. The combination of such loads would have required a very substantial wall; probably a much heavier section than the failed wall observed during my inspection.

Mr. McFarlane showed me the extent of wall damage sustained in the west end of the building and generally the type of internal shoring used in an effort to minimize wall movement. Apparently only knee braces between the wall and floor were used whereas, in my opinion, a system of horizontal and vertical wood shores (placed on the wall) used in conjunction with the braces would have distributed the imposed loads and probably saved the wall from destruction. I was advised that the slide material reached the roof line approximately 20 feet or so above the building floor.

The determination of procedures necessary for the permanent control of the landslide will require further study and probably additional borings on the slope. We would be pleased to undertake such work

when and if it becomes necessary. Please advise if we can be of further assistance in other ways at this time.

| | |
|---|---|
| [SEAL] | Sincerely, |
| LEROY K. BESTWICK | SHANNON & WILSON, INC. |
| PROFESSIONAL ENGINEER | |
| State of Washington | By [Signed] L. Keith Bestwick |
| Registered | L. Keith Bestwick, P.E. |
| | Vice President |